## HOLLY FARMS CORP. ET AL. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 95–210.   Argued February 21, 1996—Decided April 23, 1996

GINSBURG, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, SOUTER, and BREYER, JJ., joined. O'CONNOR, J., filed an opin-

ion concurring in the judgment in part and dissenting in part, in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined, *post*, p. 409.

*Charles P. Roberts III* argued the cause and filed briefs for petitioners.

*Richard H. Seamon* argued the cause for respondents. With him on the brief for respondent National Labor Relations Board were *Solicitor General Days, Deputy Solicitor General Wallace, Linda Sher, Norton J. Come,* and *John Emad Arbab. J. David James, Judith A. Scott, Jon Hiatt, Andrew D. Roth,* and *Laurence Gold* filed a brief for respondent unions.*

JUSTICE GINSBURG delivered the opinion of the Court.

This controversy stems from a dispute concerning union representation at the Wilkesboro, North Carolina, headquarters facility of Holly Farms, a corporation engaged in the production, processing, and marketing of poultry products. The parties divide, as have federal courts, over the classification of certain workers, described as "live-haul" crews— teams of chicken catchers, forklift operators, and truckdrivers, who collect for slaughter chickens raised as broilers by independent contract growers, and transport the birds to Holly Farms' processing plant. Holly Farms maintains that members· of "live-haul" crews are "agricultural laborer[s]," a category of workers exempt from National Labor Relations Act coverage. The National Labor Relations Board disagreed and approved a Wilkesboro plant bargaining unit including those employees. Satisfied that the Board reasonably aligned the "live-haul" crews with the corporation's

---

*Briefs of *amici curiae* urging reversal were filed for the American Farm Bureau Federation et al. by *Robert P. Davis, John J. Rademacher, Michael F. Rosenblum,* and *Timothy S. Bishop;* and for the National Broiler Council by *Gary Jay Kushner, John G. Roberts, Jr.,* and *Jonathan S. Franklin.*

*Joseph A. Wender, Jr.,* filed a brief for the California Agricultural Labor Relations Board as *amicus curiae.*

processing operations, typing them covered "employee[s]," not exempt "agricultural laborer[s]," we affirm the Court of Appeals' judgment, which properly deferred to the Board's determination.

## I

## A

Petitioner Holly Farms Corporation, a wholly owned subsidiary of Tyson Foods, Inc., is a vertically integrated poultry producer headquartered in Wilkesboro, North Carolina.[1] Holly Farms' activities encompass numerous poultry operations, including hatcheries, a feed mill, an equipment maintenance center, and a processing plant.

"Broiler" chickens are birds destined for human food markets.[2] Holly Farms hatches broiler chicks at its own hatcheries, and immediately delivers the chicks to the farms of independent contractors. The contractors then raise the birds into full-grown broiler chickens. Holly Farms pays the contract growers for their services, but retains title to the broilers and supplies the food and medicine necessary to their growth.

When the broilers are seven weeks old, Holly Farms sends its live-haul crews to reclaim the birds and ferry them to the processing plant for slaughter. The live-haul crews—which typically comprise nine chicken catchers, one forklift operator, and one live-haul driver—travel in a flat-bed truck from Holly Farms' processing plant to the farms of the independent growers. At the farms, the chicken catchers enter the coops, manually capture the broilers, and load them into cages. The forklift operator lifts the caged chickens onto the bed of the truck, and the live-haul driver returns the

---

[1] Holly Farms maintains various facilities throughout the United States, but this controversy concerns only its Wilkesboro operation.

[2] Holly Farms' operations also involve birds called "pullets," young chickens destined to serve as laying hens. The live-haul workers whose classification is at issue in this case work exclusively with broilers.

truck, with the loaded cases and the crew, to Holly Farms' processing plant. There, the birds are slaughtered and prepared for shipment to retail stores.

### B

In 1989, the Chauffeurs, Teamsters and Helpers, Local 391 (Union), filed a representation petition with the National Labor Relations Board (Board or NLRB), seeking an election in a proposed unit that included live-haul employees working out of Holly Farms' Wilkesboro processing plant. Over Holly Farms' objection, the Board approved the bargaining unit, ruling that the live-haul workers were "employee[s]" protected by the National Labor Relations Act (NLRA or Act), 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.*, rather than "agricultural laborer[s]" excluded from the Act's coverage by § 2(3) of the NLRA, 29 U. S. C. § 152(3). See *Holly Farms Corp.*, 311 N. L. R. B. 273, 273, n. 4, 284 (1993).[3] After further proceedings not relevant here, the Board ordered the corporation to bargain with the Union as the representative of the unit. *Id.*, at 285–286.

The United States Court of Appeals for the Fourth Circuit enforced the Board's order. The court held that the Board's classification of the live-haul workers as "employee[s]," rather than "agricultural laborer[s]," rested "on a reasonable interpretation of the Act." 48 F. 3d 1360, 1372 (1995). The Board's reading, the court added, was consistent with the NLRB's prior decisions, see *Imco Poultry, Div. of Int'l Multifoods Corp.*, 202 N. L. R. B. 259, 260–261 (1973), adhered to in *Seaboard Farms of Kentucky, Inc.*, 311 N. L. R. B. No. 159 (1993), and *Draper Valley Farms, Inc.*, 307 N. L. R. B. 1440 (1992), and with the Eighth Circuit's case law, see *NLRB* v. *Hudson Farms, Inc.*, 681 F. 2d 1105,

---

[3] Board member Oviatt dissented from the Board's classification of the live-haul employees. He viewed the crew members as "agricultural laborer[s]," and therefore unprotected by the NLRA. *Holly Farms Corp.*, 311 N. L. R. B., at 287.

1106 *(per curiam)*, cert. denied, 459 U. S. 1069 (1982), and *Valmac Industries, Inc.* v. *NLRB*, 599 F. 2d 246, 249 (1979). 48 F. 3d, at 1371–1372.[4]

Other Federal Courts of Appeals, in conflict with the Fourth and Eighth Circuits, have held that live-haul workers employed by vertically integrated poultry producers are engaged in "agriculture." See, *e. g., Coleman* v. *Sanderson Farms, Inc.*, 629 F. 2d 1077, 1079 (CA5 1980); *NLRB* v. *Ryckebosch, Inc.*, 471 F. 2d 20, 21 (CA9 1972). We granted certiorari to resolve the division of authority. 516 U. S. 963 (1995).

## II

The NLRA's protections extend only to workers who qualify as "employee[s]" under § 2(3) of the Act. 29 U. S. C. § 152(3). The term "employee," NLRA § 2(3) states, "[does] not include any individual employed as an agricultural laborer." *Ibid.* No definition of "agricultural laborer" appears in the NLRA. But annually since 1946, Congress has instructed, in riders to Appropriations Acts for the Board: "[A]gricultural laborer," for NLRA § 2(3) purposes, shall derive its meaning from the definition of "agriculture" supplied by § 3(f) of the Fair Labor Standards Act of 1938 (FLSA). See *Bayside Enterprises, Inc.* v. *NLRB*, 429 U. S. 298, 300, and n. 6 (1977).[5]

Section 3(f) of the FLSA provides:

> "'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage

---

[4] Judge Niemeyer dissented in relevant part; like dissenting Board member Oviatt, see *supra*, at 396, n. 3, he ranked the live-haul employees as "agricultural laborer[s]" unprotected by the NLRA. 48 F. 3d, at 1373.

[5] The most recent congressional rider states: "[N]o part of [the Board's] appropriation shall be available to organize or assist in organizing agricultural laborers or used in connection with investigations, hearings, directives, or orders concerning bargaining units composed of agricultural laborers as referred to in section 2(3) of the [NLRA] . . . and as defined in section 3(f) of the [FLSA]." Pub. L. 103–333, Tit. IV, 108 Stat. 2569–2570.

of the soil, dairying, the production, cultivation, grow-
ing, and harvesting of any agricultural or horticultural
commodities (including commodities defined as agricul-
tural commodities in section 1141j(g) of title 12), the
raising of livestock, bees, fur-bearing animals, or poul-
try, and any practices (including any forestry or lumber-
ing operations) performed by a farmer or on a farm as
an incident to or in conjunction with such farming opera-
tions, including preparation for market, delivery to stor-
age or to market or to carriers for transportation to
market." 29 U. S. C. § 203(f).

This definition, we have explained, "includes farming in both
a primary and a secondary sense." *Bayside*, 429 U. S., at
300. "Primary farming" includes the occupations listed first
in § 3(f): "the cultivation and tillage of the soil, dairying, the
production, cultivation, growing, and harvesting of any
agricultural or horticultural commodities . . . [and] the rais-
ing of livestock, bees, fur-bearing animals, or poultry." 29
U. S. C. § 203(f). "Secondary farming" has a broader mean-
ing, encompassing, as stated in the second part of § 3(f): "any
practices . . . performed by a farmer or on a farm as an
incident to or in conjunction with such farming operations,
including preparation for market, delivery to storage or to
market or to carriers for transportation to market." *Ibid.;*
see *Bayside*, 429 U. S., at 300, n. 7; *Farmers Reservoir &
Irrigation Co.* v. *McComb*, 337 U. S. 755, 763 (1949) (second-
ary farming embraces "any practices, whether or not them-
selves farming practices, which are performed either by a
farmer or on a farm, incidently to or in conjunction with
'such' farming operations").

If a statute's meaning is plain, the Board and reviewing
courts "must give effect to the unambiguously expressed
intent of Congress." *Chevron U. S. A. Inc.* v. *Natural Re-
sources Defense Council, Inc.*, 467 U. S. 837, 843 (1984).
When the legislative prescription is not free from ambiguity,
the administrator must choose between conflicting reason-

able interpretations. Courts, in turn, must respect the judgment of the agency empowered to apply the law "to varying fact patterns," *Bayside,* 429 U. S., at 304, even if the issue "with nearly equal reason [might] be resolved one way rather than another," *id.,* at 302 (citing *Farmers Reservoir,* 337 U. S., at 770 (Frankfurter, J., concurring)). We note, furthermore, that administrators and reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach. See 48 F. 3d, at 1370 (citing *NLRB* v. *Cal-Maine Farms, Inc.,* 998 F. 2d 1336, 1339 (CA5 1993));[6] cf. *Arnold* v. *Ben Kanowsky, Inc.,* 361 U. S. 388, 392 (1960) (exemptions from the FLSA "are to be narrowly construed against the employers seeking to assert them"); *Mitchell* v. *Kentucky Finance Co.,* 359 U. S. 290, 295 (1959) ("It is well settled that exemptions from the Fair Labor Standards Act are to be narrowly construed.").

## III

Primary farming includes the raising of poultry. See *Bayside,* 429 U. S., at 300–301. All agree that the independ-

---

[6] The legislative history suggests that Congress, in linking the definition of "agricultural laborer" in NLRA § 2(3) to § 3(f) of the FLSA, intended to cabin the exemption. The version of the appropriations rider first adopted by the House incorporated the definition of "agricultural laborer" contained in the Social Security Act Amendments of 1939, 53 Stat. 1377. See 92 Cong. Rec. 6689–6692 (1946). Some lawmakers, however, objected that the amendment contained a "very broad definitio[n] of agricultural laborer excluding a great number of processing employees" from NLRA coverage. See *id.,* at 9514 (statement of Sen. Ball). After some debate— and upon consultation with a Board member and Board counsel—the Conference Committee agreed to substitute the "much narrower definition" supplied by § 3(f) of the FLSA. See *ibid.* The dissent's reading of § 3(f), while a plausible construction of a text we, the Board, and the Secretary of Labor find less than crystalline, see *infra,* at 409, is inharmonious with a congressional will to create a slim exemption from the encompassing protection the NLRA and the FLSA afford employees in our Nation's commercial enterprises.

ent growers, who raise Holly Farms' broiler chickens on their own farms, are engaged in primary agriculture. But we confront no contention that Holly Farms' live-haul employees are themselves engaged in raising poultry.[7] Thus, the only question we resolve is whether the chicken catchers, forklift operators, and truckdrivers are engaged in *secondary* agriculture—that is, practices "performed by a farmer or on a farm as an incident to or in conjunction with such farming operations." 29 U. S. C. § 203(f).

We take up, initially, the "performed by a farmer" strand of FLSA § 3(f). We do not labor over the point, for our decision in *Bayside* securely leads us to the conclusion that the live-haul activities are not performed "by a farmer." In *Bayside*, we considered the application of § 3(f)'s "by a farmer" specification to integrated agricultural companies that contract out farming work. We upheld the Board's rejection of the contention that "all of the activity on a contract farm should be regarded as agricultural activity of an integrated farmer" such as Holly Farms. 429 U. S., at 302. When an integrated poultry producer "contracts with independent growers for the care and feeding of [its] chicks, [its] status as a farmer engaged in raising poultry ends with respect to those chicks." *Id.*, at 302, n. 9 (citing *Imco Poultry*, 202 N. L. R. B., at 260). Accordingly, when the live-haul employees arrive on the independent farms to collect broilers for carriage to slaughter and processing, Holly Farms does not resume its status as "farmer" with respect to those birds, the status Holly Farms had weeks before, when the birds

---

[7] Holly Farms, it is true, ultimately argues that the catching and loading of broilers slated for slaughter constitute primary agriculture because those activities are best viewed as the "harvesting" of chickens. See Brief for Petitioners 29–30. But Holly Farms failed to advance this argument before the Court of Appeals, and it did not home in on this contention in its petition for certiorari. Because we "generally do not address arguments that were not the basis for the decision below," *Matsushita Elec. Industrial Co.* v. *Epstein*, 516 U. S. 367, 379, n. 5 (1996), we decline to entertain Holly Farms' primary farming argument.

were hatched in its hatcheries. This conclusion, we note, entirely disposes of the contention that the truckdrivers are employed in secondary agriculture, for Holly Farms acknowledges that these crew members do not work "on a farm." Tr. of Oral Arg. 5.

. We turn, now, to the nub of the case for the chicken catchers and forklift operators: the "on a farm" strand of FLSA § 3(f).

## A

Holly Farms argues that under the plain language of the statute, the catching and loading of broilers qualifies as work performed "on a farm as an incident to" the raising of poultry. The corporation emphasizes that § 3(f) of the FLSA enumerates "preparation for market" and "delivery to storage or to market" among activities that count as "agriculture." The live-haul employees' work, Holly Farms concludes, thus falls within the domain of the FLSA exemption and, accordingly, enjoys no NLRA protection.

We find Holly Farms' position to be a plausible, but not an inevitable, construction of § 3(f). Hence, we turn to the Board's position, examining only its reasonableness as an interpretation of the governing legislation.

## B

While agreeing that the chicken catchers and forklift operators work "on a farm," the Board contends that their catch and cage work is not incidental to farming operations. Rather, the work is tied to Holly Farms' slaughtering and processing operations, activities that do not constitute "farming" under the statute. We conclude, as we next explain, that the Board's position "is based on a reasonable interpretation of the statute, is consistent with the Board's prior holdings, and is supported by the Secretary of Labor's construction of § 3(f)." *Bayside,* 429 U. S., at 303 (footnotes omitted).

1

The Board underscores the statutory words *"such* farming operations."  It does not suffice that the alleged secondary agriculture consists of "preparation for market," or "delivery to storage or to market," the Board maintains; to qualify for the statutory exemption, the Board urges, the work must be incidental to, or conjoined with, primary farming operations.[8] As just explained, see *supra,* at 400–401, at the growing stage in the short life of a broiler, Holly Farms is not involved in primary farming, but the contract growers are. The essential question, then, is whether the live-haul employees' activities are inevitably "incident to or in conjunction with" the farming operations of the independent growers.[9]  The Board answers this question in the negative.

_____

[8] As we noted in *Farmers Reservoir & Irrigation Co.* v. *McComb,* 337 U. S. 755 (1949), Congress specifically added the words "or on a farm" to FLSA § 3(f) to address some Senators' objections that the exemption otherwise would not cover "the threshing of wheat or other functions necessary to the farmer if those functions were not performed by the farmer and his hands, but by separate companies organized for and devoted solely to that particular job."  See *id.,* at 767 (citing 81 Cong. Rec. 7653 (1937)). Nothing in the Board's decision detracts from the application of § 3(f), based on the "on a farm" language, to employees of "separate companies organized for and devoted solely to" auxiliary work in aid of a farming enterprise.  Hence, the words "on a farm" do the work intended, and are not redundant.  But see *post,* at 412–413.

Holly Farms presses the argument that its live-haul employees are analogous to the wheat threshers who figured in FLSA § 3(f)'s legislative history.  The Board reasonably responds, however, that *any* worker—whether a wheat thresher, a feed-haul driver, or a chicken catcher—must perform his or her work "as an incident to or in conjunction with such farming operations" in order to fall under the agricultural exemption.  If the chicken catching crews were employed by the independent growers, rather than by Holly Farms' processing operation, those crews would more closely resemble the wheat threshers contemplated by the framers of § 3(f).

[9] To this question, the dissent asserts "there can be only one answer." *Post,* at 415.  In the dissent's view, activities "directly related to the farming operations that occurred on that very farm"—in this case, removing chickens from the independent growers' farms to make room for more—

See *Imco Poultry*, 202 N. L. R. B., at 261 (Because chicken catching crews "have no business relationship with the independent farmers, we conclude that the employees' activities were not incidental to the independent farmers' poultry raising operations.").

We find the Board's answer reasonable. Once the broilers have grown on the farm for seven weeks, the growers' contractual obligation to raise the birds ends, and the work of the live-haul crew begins. The record reflects minimal overlap between the work of the live-haul crew and the independent growers' raising activities. The growers do not assist the live-haul crews in catching or loading the chickens; their only responsibilities are to move certain equipment from the chicken coops prior to the crews' arrival, and to be present when the crews are on the farms. App. to Brief for Federal Respondent 3a. Nor do the live-haul employees play any role in the growers' performance of their contractual undertakings.

The record, furthermore, supports the Board's conclusion that the live-haul crews' activities were conjoined with Holly Farms' processing operations, rather than with farming.[10]

---

inescapably satisfy the statute. *Post*, at 414–415. FLSA § 3(f), all agree, does not apply absent a connection between the activity in question and the primary farming operations conducted "on a farm." But the statutory language—"incident to or in conjunction with"—does not place beyond rational debate the nature or extent of the required connection. See 29 CFR § 780.144 (1995) (recognition by the Secretary of Labor that the "line between practices that are and those that are not performed 'as an incident to or in conjunction with' such farming operations is not susceptible of precise definition").

[10] Holly Farms argues, and the dissent agrees, *post*, at 414, that the Board's conclusion rests on the assumption that a given activity can be incidental to one thing only—in this case, either processing or farming, but not both. At oral argument, counsel for the Board stated that Holly Farms had not accurately conveyed the Board's position. Tr. of Oral Arg. 33, 38. The Board apparently recognizes, as do we, that an activity can be incidental to more than one thing. To gain the agricultural exemption, however, farming must be an enterprise to which the activity at issue is incidental. The relevant question under the statute, therefore,

The chicken catchers, forklift operators, and truckdrivers work as a unit. They all "work out of the processing plant" in Wilkesboro, App. 22a, located three miles from the hatcheries, App. to Pet. for Cert. A–381, n. 119. Crew members begin and end each shift by punching a timeclock at the processing plant, *id.*, at A–831 to A–832, and are functionally integrated with other processing-plant employees, App. 22a. See also App. to Pet. for Cert. A–396 (correlation between Holly Farms' slaughter rate and work available for live-haul crews); App. 29a (live production manager for Holly Farms' Wilkesboro facility described catching and delivery of grown broilers as the first step in the producer's processing operations). The Board's determination, in sum, has the requisite "warrant in the record." *Bayside*, 429 U. S., at 304, n. 14 (citing *NLRB* v. *Hearst Publications, Inc.*, 322 U. S. 111, 131 (1944)).

We think it sensible, too, that the Board homed in on the status of the live-haul crews' *employer*. The employer's status respecting the particular activity at issue accounts for the Board's determination that Holly Farms' "egg haulers" (who transport eggs from the laying houses to the hatcheries), and "pullet catchers" (who collect the breeding-destined birds on the farms of independent growers) rank as "agricultural laborer[s]." As the record shows, the pullet catchers and egg haulers work in Holly Farms' hatchery operations, while the live-haul employees—who deal only with broilers—work out of the processing plant. "There is no interchange between these classifications. Broiler haulers do not haul pullets and pullet haulers do not haul broilers." App. 20a–21a. Accordingly, the Board reasonably aligned the pullet catchers and egg haulers with Holly Farms' poultry-raising operation, and the live-haul employees with the corporation's slaughtering and processing activities.

---

is whether the work of the live-haul crews qualifies as incidental to farming.

2

The Board's decision regarding Holly Farms' live-haul crews adheres to longstanding NLRB precedent. For more than 23 years, the NLRB has maintained that vertically integrated poultry producers' employees who "handl[e] and transpor[t] chicks on the farms of independent growers only after [the poultry producers'] farming operations have ended . . . cannot be performing practices incident to, or in conjunction with, [their employer's] farming operations." *Imco Poultry*, 202 N. L. R. B., at 260. Rather, such employees, the Board has repeatedly ruled, perform work "incident to, or in conjunction with, a separate and distinct business activity of [their employer], i. e., shipping and marketing." *Id.*, at 261. See also *Draper Valley Farms, Inc.*, 307 N. L. R. B., at 1440 ("We think it follows plainly from *Imco* that the Employer's chicken catchers are not, when working on the farms of independent growers who have concluded their 'raising' activities, exempt as agricultural laborers."); *Seaboard Farms of Kentucky, Inc.*, 311 N. L. R. B. No. 159 (1993) (same).[11]

3

In construing the agricultural laborer exemption, the Board endeavors to "follow, whenever possible, the interpretations of Section 3(f) adopted by the Department of Labor, the agency which is charged with the responsibility for and has the experience of administering the Fair Labor Stand-

---

[11] Our decision in *Maneja* v. *Waialua Agricultural Co.*, 349 U. S. 254 (1955), does not cast doubt on the Board's view of operations like Holly Farms. In that case, which did not involve a Board ruling, we held that railroad workers employed by an integrated sugar cane producer were exempt, as "agricultural laborer[s]," from FLSA overtime provisions. The employer in *Maneja*, unlike Holly Farms, grew and cultivated its sugar cane autonomously, without the aid of independent growers; hence, we concluded that the activities of the railroad workers, who hauled the freshly cut cane from the sugar fields to the processing plant, were incidental to the employer's primary farming operations. *Id.*, at 262–263.

ards Act." *Cornell University*, 254 N. L. R. B. 110 (1981); see also *Mario Saikon, Inc.*, 278 N. L. R. B. 1289, 1290 (1986); *Wegman's Food Market, Inc.*, 236 N. L. R. B. 1062 (1978). The Board has not departed from that endeavor here.[12] The Department of Labor's regulations do not address the precise situation of the live-haul workers before us, nor are the regulations free from ambiguity. We agree with the Board, however, that they are consistent with "employee" characterization of the crews that catch grown chickens for carriage to Holly Farms' processing plant.

On contract arrangements for raising poultry, the Department of Labor has issued an interpretative regulation, which we noted in *Bayside*, 429 U. S., at 303–304, n. 13, as follows:

> "Feed dealers and processors sometimes enter into contractual arrangements with farmers under which the latter agree to raise to marketable size baby chicks supplied by the former who also undertake to furnish all the required feed and possibly additional items. Typically, the feed dealer or processor retains title to the chickens until they are sold. Under such an arrangement, the activities of the farmers and their employees in raising the poultry are clearly within section 3(f). The activities of the feed dealer or processor, on the other hand, are not 'raising of poultry,' and employees engaged in them cannot be considered agricultural employees on that ground. Employees of the feed dealer or processor who perform work on a farm as an incident to or in conjunction with the raising of poultry on the farm are employed in 'secondary' agriculture (see

---

[12] *Coleman v. Sanderson Farms, Inc.*, 629 F. 2d 1077 (CA5 1980), which determined that chicken catching crews were employed in "agriculture" under § 3(f), involved a dispute over applicability of the FLSA's overtime provisions, not over union representation. Thus, the court in that case was not required to respect the position of the Board. See *id.*, at 1081, n. 4. We note, however, that the *Coleman* court did not advert to the Secretary of Labor's interpretations of § 3(f).

§§ 780.137 *et seq.* [explaining that work must be performed in connection with the farmer-employer's own farming to qualify as 'secondary' agriculture by a farmer] and *Johnston* v. *Cotton Producers Assn.*, 244 F. 2d 553)." 29 CFR § 780.126 (1995).

This regulation suggests that live-haul crews surely are not engaged in a primary farming operation. The crews could rank as workers engaged in "secondary" agriculture if they "perform[ed] work on a farm as an incident to or in conjunction with the raising of poultry on the farm." *Ibid.* As we developed earlier, however, see *supra,* at 402–405, in the Board's judgment, the crews do not fit that bill. The live-haul crew members perform their work, as the Board sees it, not "as an incident to" poultry raising by independent growers, but "incident to" and "in conjunction with" the slaughter and processing of chickens at Holly Farms' Wilkesboro plant. In the Board's words, the crews are tied to "a separate and distinct business activity," the business of processing poultry for retail sale, see *Imco Poultry*, 202 N. L. R. B., at 261, not to the anterior work of agriculture.[13]

Other Department of Labor regulations are in harmony with the Board's conclusion that the live-haul crews do not engage in secondary farming because their work, though "on

---

[13] The Department of Labor's interpretative regulation, 29 CFR § 780.126 (1995), includes a citation to *Johnston* v. *Cotton Producers Assn.*, 244 F. 2d, 553, 554 (CA5 1957). That case is readily distinguishable from the case before us. In *Johnston,* the Court of Appeals held that an employee of a rural farm supply store was exempt from FLSA minimum wage and overtime requirements as an agricultural laborer. The supply store sold baby chicks to farmers, while "retain[ing] title to the chicks as security for the purchase price and for advances for feed, supplies, or equipment." *Ibid.* While the supply store employee caught, cooped, and loaded chickens onto trucks for delivery to processors—entities independent of the supply store—that employee also "supervise[d] the growing of chicks by [independent] growers on their farms." *Ibid.* By contrast, in this case there is no contention that any of the live-haul employees similarly assist the independent growers in their chick-raising activities.

a farm," is not performed "as an incident to or in conjunction with" the independent growers' poultry-raising operations. Thus, 29 CFR § 780.129 (1995) reiterates that the work "must be performed 'as an incident to or in conjunction with' the farming operations," and § 780.143 adds:

> "The fact that a practice performed on a farm is not performed by or for the farmer is a strong indication that it is not performed in connection with the farming operations there conducted." *Ibid.*

The same regulation, § 780.143, further states that, in determining whether a practice is performed "for" a farmer, it is "highly significant" whether the practice involves property to which the farmer has title or for which the farmer otherwise has responsibility. *Ibid.* Holly Farms retains title to the chicks and, once the live-haul crew undertakes its catch and remove operation, the independent grower "divest[s] himself of further responsibility with respect to the product." *Ibid.*[14]

The Department of Labor candidly observed that "[t]he line between practices that are and those that are not performed 'as an incident to or in conjunction with' such farming operations is not susceptible of precise definition." § 780.144. This acknowledgment accords with our recognition that the meaning of FLSA § 3(f) is not so "plain" as to bear only one permissible construction in the context at hand.

## IV

In sum, we find persuasive the Board's conclusion that the collection of broilers for slaughter was an activity serving

---

[14] Petitioners point to 29 CFR § 780.151(k) (1995), which defines the FLSA § 3(f) words "preparation for market" to include "[c]ulling, grading, cooping, and loading" of poultry. See Brief for Petitioners 23. As another regulation emphasizes, however, "'preparation for market,' like other practices, must be performed 'by a farmer or on a farm as an incident to or in conjunction with such farming operations' in order to be within [FLSA] section 3(f)." 29 CFR § 780.150 (1995).

Holly Farms' processing operations, and not Holly Farms' own or the independent growers' farming operations. Again, we stress that "the reviewing court's function is limited." *Bayside*, 429 U. S., at 304, n. 14 (citing *Hearst Publications*, 322 U. S., at 131). For the Board to prevail, it need not show that its construction is the *best* way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one. See *Sure-Tan, Inc.* v. *NLRB*, 467 U. S. 883, 891 (1984) ("we will uphold any interpretation [of the term 'employee' in NLRA § 2(3)] that is reasonably defensible"). "[R]egardless of how we might have resolved the question as an initial matter," *Bayside*, 429 U. S., at 304, the Board's decision here reflects a reasonable interpretation of the law and, therefore, merits our approbation. The judgment of the Court of Appeals is accordingly

*Affirmed.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, concurring in the judgment in part and dissenting in part.

Today the Court concludes that three categories of workers fall outside the definition of "agricultural laborer" supplied by § 3(f) the Fair Labor Standards Act of 1938 (FLSA) and § 2(3) of the National Labor Relations Act (NLRA): (1) Holly Farms' chicken catchers, who labor on a farm manually rounding up, catching, and caging live chickens, (2) forklift operators, who then load the caged chickens onto the bed of a flatbed truck, and (3) live-haul drivers, who drive the loaded trucks to Holly Farms' processing plants, where the chickens are slaughtered and prepared for market. I concur in the Court's judgment with respect to the live-haul drivers, since their work is neither performed "by a farmer" nor "on a farm." But the Court's conclusion that Holly Farms' chicken catchers and forklift operators do not perform agricultural work runs contrary to common sense and finds no

support in the text of the relevant statute. Because the definition supplied by Congress makes clear that the chicken catchers and forklift operators are agricultural workers exempt from the reach of the NLRA, I respectfully dissent.

The Court devotes the bulk of its opinion to an analysis of the reasonableness of the National Labor Relations Board's (Board) interpretation of the statute, but gives remarkably short shrift to the statute itself. The Court dismisses Holly Farms' claim that the plain language of the statute covers the chicken catchers and forklift operators with the conclusory remark that Holly Farms' reading of the statute is "a plausible, but not an inevitable, construction of § 3(f)." *Ante*, at 401. In my view, however, the language of the statute is unambiguous.

As we said in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984): "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.*, at 842–843. None of our precedents sanction blind adherence to the Board's position when it is directly contrary to the plain language of the relevant statute. See, *e. g.*, *NLRB* v. *Brown*, 380 U. S. 278, 291 (1965) ("Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute"); *American Ship Building Co.* v. *NLRB*, 380 U. S. 300, 318 (1965) ("The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia . . ."). Section 3(f) of the FLSA defines agriculture as "farming in all its branches," including "the raising of . . . poultry," as well as "any practices . . . performed by a farmer *or on a farm as an incident to or in conjunction with such farming operations.*" 29 U. S. C. § 203(f) (emphasis added). The coverage

intended by Congress under both the FLSA and the NLRA is best determined by consulting the language of the statute at issue. Because the relevant portions of §3(f) are perfectly plain and "directly [speak] to the precise question at issue," *Chevron, supra,* at 842, I would hold that the chicken catchers and forklift operators are agricultural laborers and that the Board's contrary conclusion does not deserve deference.

The Court's determination rests largely upon a misreading of the statute in two respects. First, the Court tethers the "or on a farm" clause of §3(f) to the employment relationship (or lack thereof) between the chicken catchers and forklift operators and the independent farmer who is charged with raising the chickens. And second, the Court decides that the secondary farming activities performed by the chicken catchers and forklift operators must not only be "incident" to the independent farmer's primary farming activities, but must be "mainly" or "most tightly" tied thereto. Neither conclusion finds support in the language of §3(f).

The Court's first error stems from its adoption of the Board's focus on the lack of a direct employment relationship between the live-haul workers and the independent growers. But the "or on a farm" clause nowhere mentions the nature of the employment relationship. Instead, it is plainly concerned only with the *nature* of the work performed by the worker. The Board's interpretation must be rejected, as it would read the "or on a farm" clause out of the statute entirely.

The Court relies on the legislative history underlying the "or on a farm" clause, which we described in *Farmers Reservoir & Irrigation Co.* v. *McComb,* 337 U. S. 755, 763 (1949). That history reveals that the clause was intended to include within the statutory definition work performed on a farm that was "necessary to" the farming operations but not performed by the farmer himself. *Id.,* at 767. One example figures prominently in the legislative history: a wheat

thresher who travels from farm to farm performing wheat threshing chores for small farmers on a contract basis. The Court reasons that Holly Farms' employees are unlike the fictional wheat thresher, however, in that they are employed by Holly Farms, rather than by the independent growers themselves. See *ante,* at 402, n. 8 ("If the chicken catching crews were employed by the independent growers, rather than by Holly Farms' processing operation, those crews would more closely resemble the wheat threshers contemplated by the framers of § 3(f)").

The Court and the Board emphasize formal contractual arrangements to the virtual exclusion of practical realities. The fact that Holly Farms supplies the services of the chicken catchers and forklift operators seems entirely beside the point; the work performed by these employees is precisely the same whether they are hired by Holly Farms or by the independent growers. And the notion that Congress intended the status of the chicken catchers and forklift operators to turn on such a readily manipulable criterion strains credibility. If the live-haul crew's status depends only upon who "hires" them to perform the work, Holly Farms can simply charge the independent growers with raising *and* catching, caging, and cooping the chickens, and require the independent growers to hire Holly Farms' own live-haul workers to perform those tasks.

The Court's quotation from *Imco Poultry, Div. of Int'l Multifoods Corp.,* 202 N. L. R. B. 259 (1973), reveals precisely where the Board and the Court have gone astray: The Board takes the position that live-haul workers "'cannot be performing practices incident to, or in conjunction with, [their employer's] farming operations.'" *Ante,* at 405 (quoting *Imco Poultry, supra,* at 260). But the statute does *not* require that work be performed "incident to or in conjunction with" one's *employer's* farming operations, but only incident to or in conjunction with "such" farming operations— the antecedent for which term is plainly the first clause of

§ 3(f), to wit, "farming in all its branches," including "the raising of . . . poultry." If the *sine qua non* of status as an agricultural laborer is employment *by the farmer or the independent grower*, the "or on a farm" clause is redundant, because chicken catching crews that are agents or employees of the farmers themselves fall within the "by a farmer" clause. Ordinarily, "terms connected by a disjunctive [are] given separate meanings, unless the context dictates otherwise." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979). The "or on a farm" clause has independent significance only if the work encompassed by that clause is performed by someone *other than* a farmer or the farmer's own agents or employees. *Chevron* deference is not owed to a Board construction of the statute that effectively redacts one of the statute's operative clauses.

The Court also cites with approval a Department of Labor (DOL) interpretive regulation that addresses contractual arrangements for raising poultry such as those between Holly Farms and the independent growers. The DOL regulation declares that "[e]mployees of [a] feed dealer or processor who perform work on a farm as an incident to or in conjunction with the raising of poultry on the farm are employed in 'secondary' agriculture." 29 CFR § 780.126 (1995). The Court thus accepts as reasonable a DOL regulation that plainly suggests that even workers *employed by* a poultry processor such as Holly Farms can be engaged in secondary agriculture and also accepts as reasonable a Board interpretation of § 3(f) that, in essence, dictates that employees of a processor cannot be employed in secondary agriculture. See *ante*, at 404 ("We think it sensible . . . that the Board homed in on the status of the live-haul crews' *employer*") (emphasis in original). The Court cannot have it both ways, and it need not, since the "or on a farm" clause is plainly indifferent to the nature of the employment relationship.

The Court's second misstep likewise derives from its deference to a Board construction that lacks foundation in the

statute. Section 3(f) exempts work performed "as an incident to or in conjunction with" primary farming operations. The statutory language manifestly does not disqualify the work from agricultural status if it also "serve[s]," *ante*, at 408, or is "tied to," *ante*, at 407, some other enterprise. Even accepting the Court's conclusion that the work of the chicken catchers and forklift operators is "incident to" Holly Farms' processing operations, those workers fall within the § 3(f) definition so long as their work is *also* "incident to or in conjunction with" the farming operations performed by the independent growers.

As Holly Farms points out, the Board's contrary position hinges on the premise that a given activity can only be incident to one thing—either processing or farming, but not both. But the Board's position cannot be squared with the statute itself, which places no conditions upon the statutory prerequisite that work be "incident to or in conjunction with" covered farming operations. Indeed, the wheat thresher of the legislative history was clearly performing work "incident to" the business operations of the wheat threshing enterprise as well as "incident to" the farmer's farming operations. The statutory requirement is simple, and the imposition of a more stringent prerequisite must be rejected as contrary to the statute itself.

When the chicken catchers and forklift operators arrive at the farm of an independent grower to catch, cage, and load the live chickens in preparation for their delivery to market, they are certainly doing work that is directly related to the farming operations that occurred on that very farm during the preceding weeks: the raising of poultry. As Holly Farms points out, unless the chickens are caught, caged, and removed from the farm, the independent grower's farming operations will have been for naught. The independent grower must see to it that the chickens grow to the designated age and are caught, removed, and replaced with new chicks for the next growing cycle. See Brief for Petitioners

23. And the fact that § 3(f) lists "preparation for market" as one of the activities that customarily is "incident to or in conjunction with" covered farming operations buttresses petitioners' argument.

. The Court's response relies on the facts that the independent grower's contractual duties have ended, that the workers punch a timeclock in Holly Farms' processing plant rather than in Farmer Brown's barn, and that Holly Farms rather than the independent grower signs their paychecks at the end of the day. But these facts are irrelevant to the statutory definition. Section 3(f) asks only whether the chicken catchers and forklift operators perform work "on a farm" (which all parties concede they do) and whether that work is "incident to or in conjunction with such farming operations"—that is, whether the activities of the chicken catching crews are "incident to" the covered farming operations that take place on the farms of the independent growers, the raising of poultry for slaughter. To that question, there can be only one answer.

Because the Court today defers to an NLRB interpretation that runs directly contrary to the statutory language, I respectfully dissent from the Court's conclusion with respect to the chicken catchers and forklift operators.