# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-2600
_____

David Bills

*Plaintiff - Appellant*

v.

Cactus Family Farms, LLC; CRE Holdings, LLLP; SMG Management, LLC;
Cactus Operating, LLC

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Northern District of Iowa - Central
_____

Submitted: April 15, 2021
Filed: July 15, 2021
_____

Before LOKEN, WOLLMAN, and STRAS, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

David Bills appeals the district court's[1] grant of summary judgment in favor of Cactus Family Farms, LLC (Cactus or Cactus Farms). Bills claims that Cactus violated the overtime provisions of the Fair Labor Standards Act (FLSA). See 29 U.S.C. § 207(a)(1). Cactus contends that Bills is an "employee employed in agriculture" and therefore exempt under 29 U.S.C. § 213(a)(6). We affirm.

Background

Cactus Farms is a pork production company headquartered in Amarillo, Texas, with its pork operations based in Osceola, Iowa. Cactus breeds pigs at its own facilities (sow farms) and then raises the pigs through a multi-site production model. When the piglets are three weeks old, they are transported by truck from Cactus's sow farms to either a nursery or a wean-to-finish farm. Piglets sent to nursery farms are later transported by truck from the nursery to finishing farms, where they remain until they reach target market weight. Piglets sent directly to wean-to-finish farms remain there until they reach target market weight. When pigs reach their target market weight, they are loaded onto a truck and transported to a processing plant for slaughter and processing.

Cactus retains title to the pigs until they are delivered to a processing plant. The nurseries, wean-to-finish farms, and finishing farms are owned and operated by either Cactus or an independent contractor (independent contract grower). If the pigs are delivered to an independent contract grower farm, the independent contract grower is responsible for raising them until they are ready for transport. Independent contract growers are responsible for loading the pigs from their farms onto trucks. Once loaded, the pigs are transported either to another farm or to a third-party-owned-and-operated processing plant.

---

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

Utilizing multiple sites throughout the pigs' life cycles reduces the risk of their becoming ill and also addresses key biosecurity protocols. Ensuring that animals are properly loaded for transport also protects biosecurity interests. Their becoming overly excited or stressed during loading affects the welfare of both the pigs on the truck and those left on the farm. The parties agree that stress and excitement during loading for processing also affects the quality of the meat.

In his role as Animal Care Auditor for Cactus, Bills spent 80% of his time conducting load assessments. Bills's job during a load assessment was to assess and observe the truckers, trucks, and load crews to make sure that proper biosecurity and safety protocols were being followed and to ensure that the animals were not abused. Bills assessed the loading chute's placement, the adequacy of the air pressure and lighting, and the overall loading conditions. Specifically, Bills inspected the chute and facilities for sharp objects, angles, or broken gates that could injure the animals during loading; ensured that the crew was large enough to handle loading without additional hardship to the animals; and monitored the crew's use of electric shock prods. Bills also assessed other conditions, such as the crew's vocalization, the pigs' loading order and spacing, and the employees' attitudes—all of which can stress, excite, or otherwise affect the temperament of the pigs.

The parties agree that, although Bills conducted some load assessments of pigs being moved from sow farms or from nurseries, the majority of his load assessments were conducted at independent contract growers' finishing farms while pigs were being loaded for transport to processing plants. Bills worked for and reported back to Cactus Farms but possessed the authority to, and at times did, intervene in the independent contract growers' loading process. The issue on appeal is whether these load assessments constitute "agriculture" within the meaning of the FLSA.

Analysis

We review the district court's grant of summary judgment *de novo*, viewing the genuinely disputed facts and drawing all reasonable inferences in Bills's favor. Young-Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 911 (8th Cir. 2011). Section 3(f) of the FLSA provides, in relevant part:

> "Agriculture" includes farming in all its branches [including] . . . the raising of livestock, . . . and any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f). This definition "includes farming in both a primary and a secondary sense." Bayside Enters., Inc. v. N.L.R.B., 429 U.S. 298, 300 (1977). Bills contends that the district court erred in concluding that he was employed in both primary and secondary agriculture and therefore an exempt employee.[2] See 29 U.S.C. § 213(a)(6).

Secondary agriculture encompasses "any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." Holly Farms Corp. v. N.L.R.B., 517 U.S. 392, 398 (1996) (alteration in original) (quoting 29 U.S.C. § 203(f)). It is undisputed that Bills was not a farmer. Id. at 400 ("When an integrated poultry producer contracts with independent growers for the care and feeding of its chicks, its status as a farmer

---

[2]As set forth below, we conclude that Bills was employed in secondary agriculture. Accordingly, we do not reach the question of whether he was employed in the raising of livestock, *i.e.*, primary agriculture. See 29 U.S.C. § 203(f); Bayside Enters., 429 U.S. at 300–01.

engaged in raising poultry ends with respect to those chicks." (cleaned up)); see also Bayside Enters., 429 U.S. at 303 (employee's "farmer" status "is determined by the character of the work which [he] perform[s] for [his] own employer"). It is also undisputed that his load assessments were conducted on a farm. Thus, the only question we must resolve is whether Bills's load assessments were "an incident to or in conjunction with such farming operations." 29 U.S.C. § 203(f).

The agricultural exemption was intended to "embrace the whole field of agriculture." Maneja v. Waialua Agric. Co., 349 U.S. 254, 260 (1955). Congress specifically added the words "or on a farm" to 29 U.S.C. § 203(f) to address the concern expressed by some members of the Senate that the exemption would not otherwise cover "the threshing of wheat or other functions necessary to the farmer if those functions were not performed by the farmer and his hands, but by separate companies organized for and devoted solely to that particular job." Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 767 (1949). Whether on-the-farm practices are "an incident to or in conjunction with such farming operations" is necessarily a fact intensive inquiry. See 29 C.F.R. § 780.144 (2020) ("The line . . . is not susceptible of precise definition."); id. § 780.145 (2020) (a practice's character "must be determined by examination and evaluation of all the relevant facts and circumstances in the light of the pertinent language and intent of the Act").

The Supreme Court determined in Holly Farms that on-the-farm work was not secondary agriculture when the work was reasonably "not incidental to farming operations."[3] 517 U.S. at 401. Holly Farms hatched chickens and, while retaining title thereto, contracted with independent growers to raise the chickens on

[3]The Court was reviewing a National Labor Relations Board decision and the Board's determination that the work in question was excluded from the statutory definition of agriculture. 517 U.S. at 401; id. at 409 (stressing that review was limited to whether Board's interpretation was a reasonable one).

independent grower farms.  When the chickens were grown, Holly Farms sent its live-haul crews to catch and transport them to Holly Farms' processing facilities for slaughter and processing.  Live-haul crews began and ended their shifts at Holly Farms' processing plants, were "functionally integrated with other processing-plant employees," and were described as "the first step in the producer's processing operations."  Id. at 404.  Holly Farms argued that because the work in question (catching and transporting chickens) took place on the independent grower farms, the live-haul crews were engaged in secondary agriculture.  Id. at 401.  The Court concluded, however, that the facts reasonably supported the conclusion that the work was "tied to Holly Farms' slaughtering and processing operations" rather than to the farm's poultry-raising operations.  Id.  The Court noted that there was "minimal overlap between the work of the live-haul crew and the independent growers' raising activities."  Id. at 403.  The contractual raising obligations of the independent growers were completed before the live-haul crew arrived, and the growers were not involved in the loading process.  Id.

Bills argues that, like the live-haul crew in Holly Farms, his work was not "incident to or in conjunction with" the independent contract growers' farming operations.  We disagree.  Like Holly Farms, Cactus Farms retains title to the pigs while contracting with independent contract growers to raise the pigs to target market weight.  Unlike Holly Farms, however, Cactus Farms does not own the processing plants and it relinquishes title to the animals when the pigs are delivered to the processing plant. Similar to the live-haul crews, Bills was employed by Cactus Farms but conducted load assessments on the independent contract growers' farms.  Unlike in Holly Farms, however, Bills's work occurred during the independent contract growers' ongoing contractual obligation to raise the pigs, which included loading the pigs onto trucks for transport off the farm.  By preventing animal abuse and monitoring factors affecting the pigs' temperament, Bills's load assessments contributed to the welfare of the pigs being loaded, as well as that of those remaining on the farm.  We thus find no genuine dispute of material fact whether Bills's load

assessments were incident to anything other than the independent contract growers' pig-raising operations and conclude as a matter of law that he was employed in secondary agriculture.

Bills argues that his load assessments were not "an incident to or in conjunction with" the independent contract growers' farming operation because his work fails to meet the three-part test laid out in Department of Labor regulation 29 C.F.R. § 780.144 (2020). Section 780.144 provides that an activity is generally "within the statutory language [of 29 U.S.C. § 203(f)] only if it constitutes an established part of agriculture, is subordinate to the farming operations involved, and does not amount to an independent business." Specifically, Bills argues that he was not subordinate to the independent contract growers because he was hired and contracted by Cactus Farms rather than by the farmers. See id.; see also id. § 780.129 (on-the-farm activities must be performed "in connection with farming operations conducted on the farm where the practice is performed"). Bills fails to address 29 C.F.R. § 780.145 (2020), which states that "mechanical application of isolated factors or tests" does not control the determination of whether an on-the-farm activity is "part of the agricultural activity," however. See id. ("Rather, the total situation will control.").

Regardless, as we have already explained, Bills's work was simultaneous to and concomitant with the independent contract growers' loading processes during their ongoing pig-raising obligations, and so the statutory language unambiguously applies here. Thus, the regulations' interpretation of the statute is not controlling. See N. Nat. Gas Co. v. O'Malley, 277 F.2d 128, 134 (8th Cir. 1960) ("The primary function of a regulation is to interpret an ambiguous statute and clarify its meaning. If the statute is unambiguous, there is no room for construction.").

We find unpersuasive Bills's argument that his on-the-farm activities are not within the statutory language because they benefitted Cactus Farms' interests rather than the farmer's interests. Unlike in Holly Farms, Bills's tasks were performed

while the independent contract growers were still raising the pigs for Cactus Farms. See 517 U.S. at 408 (finding that the live-haul crew's work was not "for" the farmer because the farmer had neither title to nor responsibility for the chickens while the live-haul crew worked (applying 29 C.F.R. § 780.143 (1995))). Bills's load assessments furthered the independent contract growers' enterprise by ensuring the pigs' continued welfare during the loading process. Both Bills's load assessments and the independent contract growers' feeding and watering of the pigs throughout their lifetime served the same purpose, that of ensuring the quality and quantity of Cactus Farms' animals when delivered to the processing plant. We therefore disagree with the argument that Bills's load assessments were unconnected to the independent contract growers' farming operations simply because they also served his employer's interests.

Conclusion

We conclude that Bills's load assessments were on-the-farm practices "incident to or in conjunction with such farming operations" regardless of whether the assessment was for the transportation of pigs between farms or for their transportation from a farm to processing. See Holly Farms, 517 U.S. at 398 (secondary agriculture "includ[es] preparation for market, delivery to storage or to market or to carriers for transportation to market" (quoting 29 U.S.C. § 203(f))).

As discussed above, in modern, multi-site pork production operations, pigs are loaded onto trucks for transport at least twice during their lifetimes. Bills's load assessments ensured that that process was conducted safely, in compliance with protocols, and without abuse to the animals. Thus, despite the fact that a farmer loading his own pigs may not have needed someone to conduct load assessments, Bills's load assessments are an accepted part of modern pork production. See Farmers Reservoir, 337 U.S. at 760–62 (agriculture is defined with reference to the particulars of an industry, not according to the traditional understanding of farming).

The grant of summary judgment is affirmed.

_____