United States Court of Appeals
Fifth Circuit

F I L E D

July 3, 2003

Charles R. Fulbruge III
Clerk

In the
United States Court of Appeals
for the Fifth Circuit

———————

m 02-60522

———————


SANDERSON FARMS, INC. (PRODUCTION DIVISION),

Petitioner-
Cross-Respondent,

VERSUS

NATIONAL LABOR RELATIONS BOARD,

Respondent-
Cross-Petitioner.


———————

Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

———————


Before SMITH, WIENER, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Sanderson Farms, Inc. (Production Division) ("Sanderson Production"), seeks review of a decision of the National Labor Relations Board ("NLRB" or "Board") finding that live-haul and pull-up drivers employed at Sanderson Production's McComb, Mississippi, facility fell outside the National Labor Relations Act's ("NLRA's") exemption to employee status for agricultural

laborers. Sanderson Production argues that *Coleman v. Sanderson Farms, Inc.*, 629 F.2d 1077, 1081 (5th Cir. 1980), which held that its drivers were agricultural laborers, controls. The NLRB has filed a cross-application for enforcement of its order. Concluding that *Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996), controls and that *Coleman* is overruled, we deny the petition for review and grant the cross-petition for enforcement.

## I.
### A.

Sanderson Production, a wholly-owned subsidiary of Sanderson Farms, Inc., purchases day-old pullet chicks and places them on independent contract farms, which Sanderson Production flock supervisors monitor. The contract farms grow the pullets to a certain age, at which point Sanderson Production transfers them to hen farms to produce the hatching eggs. Sanderson Production then moves the eggs to its hatchery, where it incubates and hatches the broiler chicks. Day-old broiler chicks are sent to a different set of independent contract farms, which raise them for about seven weeks. This relationship has three noteworthy characteristics: (1) Farmers must raise the broiler chicks in accordance with Sanderson Production's Broiler Production Agreement; (2) Sanderson Production retains title to the chickens; and (3) Sanderson Production's flock supervisors visit the contract farms at least twice a week to ensure they have enough feed and to monitor that the farmers are raising the chickens in compliance with Sanderson Production's extensive requirements.

Once the birds reach a certain weight, Sanderson Production supervisors instruct their live-haul drivers to pick up the chickens to bring them to the live-haul shed next to, and on the same property as, Sanderson Farms, Inc. (Processing Division) ("Sanderson Processing"). Sanderson Production's drivers report to and work out of the live-haul shed, but the drivers have little or no contact with Sanderson Processing. The paychecks that the drivers receive are issued by Sanderson Farms, Inc., the parent company. At the independent contract farms, other employees catch the chickens and load them onto the trucks; the drivers are not involved in this activity.[1] Once the live-haul drivers return to the live-haul shed, the chickens are held there until the pull-up drivers take them to the processing facility for slaughter.

### B.

The United Food and Commercial Workers Union, Local 1529 sought an election to become the exclusive bargaining representative for all live-haul and pull-up drivers employed at the McComb facility. At the representation proceeding, Sanderson Production contended that the drivers were exempt as agricultural laborers, but the NLRB Regional Director ("Director") concluded that Sanderson Production was not a "farmer," nor were its drivers "agricultural laborers" within the meaning of the exemption in § 2(3) of the NLRA.[2] The Director ordered an election, and the NLRB affirmed the Director's finding that Sanderson Production was not a "farmer."

---

[1] During hot weather, drivers may be asked to hose down chickens to keep them cool during the loading process.

[2] The Director also found that Sanderson Production and Sanderson Processing constituted a "single employer," but the Board found it unnecessary to rely on that conclusion.

The live-haul and pick-up drivers subsequently elected the union as their bargaining representative, but Sanderson Production refused to bargain. The union filed a complaint with the NLRB and moved for summary judgment. The Board ordered Sanderson Production to bargain.

## II.
### A.

It is the NLRB's "'special duty' to apply the [NLRA's] exemption for agricultural laborers to varying fact patterns." *NLRB v. Cal-Maine Farms, Inc.*, 998 F.2d 1336, 1339 (5th Cir. 1993).

> In performing that duty, the Board is charged with construing the [NLRA] SSincluding its incorporation of the term "agricultural laborer" as used in the Fair Labor Standards ActSSliberally in favor of the workers for whose protection those laws were designed, and [ ] any exemption from the terms of those laws must be narrowly construed.

*Id.* (citations and internal quotation marks omitted).

> Because the Board engages in an expert construction of the agricultural laborer exemption, its decision is entitled to deference on review. *Id.*

> If a statute's meaning is plain, the Board and reviewing courts must give effect to the unambiguously expressed intent of Congress. When the legislative prescription is not free from ambiguity, the administrator must choose between conflicting reasonable interpretations. Courts, in turn, must respect the judgment of the agency empowered to

apply the law to varying fact patterns, even if the issue with nearly equal reason might be resolved one way rather than another.

*Holly Farms*, 517 U.S. at 398-99 (citations and punctuation omitted). To reverse the Board's legal interpretation of a statute, we must decide that the plain meaning of the statute unambiguously contradicts the Board's interpretation or that it is inconsistent with prior Board holdings.[3]

We review the Board's factual determinations for substantial evidence. *Cal-Maine Farms*, 998 F.2d at 1339. We must "consider the totality of evidence in the record, including 'that which fairly detracts from the [Board's] decision.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). There must be "more than a scintilla" of evidence, or "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Id.* (citations and internal quotation marks omitted).

### B.

The protections of the NLRA, including the right to bargain through a union, extend only to "employees;" this term, as defined by the Act, excludes "any individual employed as an

---

[3] *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 303-04 (1977) (finding the Board's conclusion "that these truck drivers are not agricultural laborers is based on a reasonable interpretation of the statute, is consistent with the Board's prior holdings, and is supported by the Secretary of Labor's construction of [section] 3(f)"); *see Holly Farms*, 517 U.S. at 401 (examining the Board's position only for "its reasonableness as an interpretation of the governing legislation," despite finding Holly Farms's legal position plausible).

agricultural laborer." 29 U.S.C. § 152(3). The NLRA contains no definition for "agricultural laborer," but Congress has long provided that this term derives its meaning from the definition of "agriculture" supplied by § 3(f) of the Fair Labor Standards Act ("FLSA"),[4] which provides, in relevant part:

> Agriculture includes farming in all its branches and among other things includes . . . the raising of livestock, bees, fur-bearing animals, or poultry, and any practices . . . *performed by a farmer or on a farm* as incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f) (emphasis added).

This definition "includes farming in both a primary and secondary sense." *Bayside*, 429 U.S. at 300.

---

[4] Annually, since 1946, Congress has so instructed in riders to Appropriations Acts for the Board. *See Holly Farms*, 517 U.S. at 397. The most recent incarnation states that "no part of this appropriation shall be available to organize or assist in organizing agricultural laborers or used in connection with investigations, hearings, directives, or orders concerning bargaining units composed of agricultural laborers . . . and as defined in section 3(f) of the [FLSA], and including in said definition employees engaged in the maintenance and operation of ditches, canals, reservoirs, and waterways when maintained or operated on a mutual, nonprofit basis and at least 95 percent of the water stored or supplied thereby is used for farming purposes." Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11 (2003).

"Primary farming" includes the occupations listed first in § 3(f): "the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities . . . [and] the raising of livestock, bees, fur-bearing animals, or poultry." 29 U.S.C. § 203(f). "Secondary farming" has a broader meaning, encompassing, as stated in the second part of § 3(f): "any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

*Holly Farms*, 517 U.S. at 397.

Though the raising of poultry falls squarely within the ambit of primary farming, "hauling products to or from a farm is not primary farming" and may be considered secondary farming only "if it is work performed 'by a farmer or on a farm as an incident to or in conjunction with such farming operations . . . .'" *Bayside*, 429 U.S. at 300-01. Discussing poultry producers, the Court has found that "[a]n employer's business may include both agricultural and nonagricultural activities." *Id*. at 301. Thus, even though a poultry producer may be characterized as a farmer with respect to some of its operations, that status does not extend automatically to all of its operations.

### C.

Sanderson Production contends that because the company is engaged in raising poultry, it is a farmer engaged in primary farming. It argues that its drivers are

4

employed to assist in the raising of poultry, and thus are engaged in secondary farming activities in conjunction with Sanderson Production's primary farming operations, including "delivery to storage or to market."

The Supreme Court has affirmed the Board's consistent conclusion that "when an employer contracts with independent growers for the care and feeding of an employer's chicks, the employer's status as farmer engaged in raising poultry ends with respect to those chicks." *Id.* at 302 & n.9 (quoting *In re Imco Poultry*, 202 N.L.R.B. 259, 260 (1973)). The Board has characterized the activities of poultry producer employees who handle and transport chicks on independent farms as engaged "in nonfarming operations which are incident to, or in conjunction with, a separate and distinct business activity of the [poultry producer], i.e., shipping and marketing." *Imco Poultry*, 202 N.L.R.B. at 260-61; *In re Norton & McElroy*, 133 N.L.R.B. 104, 107 (1961).

Against this contrary precedent, Sanderson Production appears to argue that it maintains great enough control over its independent contract farmers such that the company never loses its status as a farmer, or that its status as a farmer resumes when it retrieves the chicks from the independent contract farmers.[5] The

work of the live-haul and pull-up drivers, accordingly, is performed "by a farmer." The Board, however, concluded that Sanderson Production's status as farmer ceases when it sends its chicks to independent contract farms.

*Bayside* concerned the status of drivers that transported poultry feed from the producer's feedmill to numerous independent contract farms. *See Bayside*, *id.* at 301-02. Bayside provided each farm with chicks, feed, medicine, fuel, litter and vaccine; dropped off and picked up the chicks; and retained title to the chicks. *Id.* Despite the "pervasive character of [the producer's] control over the raising of the chicks," the Court concluded that the farming activity of such independent growers cannot be attributed to the poultry producer. *Id.* at 302. Furthermore, in *Holly Farms* the Court held that when live-haul drivers "arrive on the independent farms to collect broilers for carriage to slaughter and processing, Holly Farms does not resume its status as 'farmer' with respect to those birds, the status Holly Farms had weeks before, when the birds were hatched in its hatcheries." *Holly Farms*, 517 U.S. at 400.

---

[5] Sanderson Production also supports its contention that it remains engaged in primary farming by citing *Nat'l Broiler Marketing Ass'n v. United States*, 436 U.S. 816 (1978), in which the Court found that companies not engaging in certain types of activities were not farmers, *id.* at 827-28. Sanderson Production argues that because it engages in these activities, i.e. owning a breeder flock and a hatchery, it necessarily must be a farmer. We disagree. The Court's conclusion does not dictate that engaging in said activities is sufficient (continued...)

[5] (...continued) to render an organization a farmer in all of its activities. In *National Broiler*, the Court was interpreting the definition of "farmer" under the Capper-Volstead Act, a law that allowed farmers to form a certain type of agricultural organization without violating antitrust laws. *See Nat'l Broiler*, 436 U.S. at 824-25. There is no obvious connection between the use of "farmer" in this Act to the interpretation of "farmer" under the NLRA or FLSA. *National Broiler* can be further distinguished because it was an antitrust suit that made no reference to, nor required any deference to, the NLRB's interpretation of what constitutes farming activity.

Consistent with the Board's decisions affirmed by the Supreme Court, Sanderson Production is not a farmer when it sends its live-haul drivers to retrieve chickens from independent farms and take them to slaughter. The drivers also cannot derive their status from the work of the independent farms, because these farms do not employ the drivers. Sanderson Production does not appear to argue that the live-haul drivers and pull-up drivers work "on a farm" for purposes of the FLSA definition of agriculture.[6] Therefore, the Board's decision that the truck drivers are not agricultural laborers engaged in secondary farming is reasonable and is supported by substantial evidence.[7]

D.

Sanderson Production argues that *Coleman*, 629 F.2d at 1080-81, which distinguished *Bayside* but preceded *Holly Farms*, controls. The *Coleman* court, also considering the operations of Sanderson Production's live-haul and pull-up drivers, found that "unlike the operation of a feedmill in *Bayside*, Sanderson's practice here must be characterized as agricultural activity." *Id*. at 1081. It based this conclusion on the assertion that "[t]ransportation of grownout broiler chickens from the contract farms where they are raised to the processing plants where they are sold is clearly work performed 'by a farmer . . . as an incident to or in conjunction with' Sanderson's primary farming task of raising poultry." *Id*. It explained further that such transportation came within the secondary farming language of "preparation for market"

---

[6] In any event, the drivers do not work "on a farm," because neither Sanderson Production nor the live-haul shed is considered to be a farm at the point during which the drivers' perform their work duties. Further, the drivers participate in none of the activities, such as catching and loading chickens, that arguably occur "on a farm."

[7] Sanderson Production attempts to distinguish *Holly Farms* by arguing that *Holly Farms* never addressed whether live-haul employees were engaged in the primary farming task of raising poultry. Sanderson Production fails, however, to make an argument that the drivers *are* engaged in primary agriculture; it contends only that its "live-haul and pull-up drivers perform *secondary farming activities* in conjunction with Sanderson Production's primary farming operations, including 'delivery to storage or to market.'" (Emphasis added.)

Sanderson Production also argues that, unlike the petitioner in *Holly Farms*, it is formally separate from Sanderson Processing, thus the drivers are actually hauling chickens "to market" when they deliver them to the processing facility. The Board rejected this contention, finding that San-
(continued...)

[7] (...continued)
derson Farms, Inc., is a vertically integrated enterprise. We need not review the Board's finding. In *Holly Farms*, the Court's discussion of whether workers were more connected to processing or to farming operations concerned only the chicken catchers and the forklift operators. *Holly Farms*, 517 U.S. at 401. The Court was concerned with whether the catching and loading of chickens was "work performed on a farm as incident to the raising of poultry," or was more related to the processing and slaughter of the chickens. *Id*. In contrast to that analysis, the Court quickly concluded that truck drivers were not agricultural laborers. *Id*. at 400-401.

This case concerns only truck drivers, who are separate from the workers that catch and load the chickens. Irrespective of whether Sanderson Farms, Inc., is vertically integrated, the drivers cannot be considered agricultural laborers, because they are not engaging in practices by a farmer or on a farm.

and "delivery to storage or to market." *Id*. Sanderson Production argues that the Board erred in not relying on *Coleman*, because that case addressed exactly the same company and practices at issue here.

Similar to *Holly Farms*, and dissimilar to *Coleman*, this case arises from a dispute over union representation and requires deference to a Board decision. Given the procedural posture and in light of *Bayside* and *Holly Farms*, we have no difficulty finding that this case is, at a minimum, distinguishable from *Coleman*.[8]

Furthermore, *Coleman* is necessarily overruled by *Holly Farms*. In both cases, the respective employers conceded that the drivers were not engaged in primary farming and did not work "on a farm."[9] Therefore *Coleman*,

like *Holly Farms*, considered whether the drivers performed work "by a farmer . . . as an incident to or in conjunction with [] farming operations, including . . . delivery . . . to market or to carriers for transportation to market." 29 U.S.C. § 203(f).[10] Both courts also appear to have agreed that "[w]hen an integrated poultry producer 'contracts with independent growers for the care and feeding of [its] chicks, [its] status as a farmer engaged in raising poultry ends with respect to those chicks.'"[11]

---

[8] *Coleman* distinguished *Bayside* by stating that "[g]iven the different procedural posture of this case and a different agency, the policy of judicial deference to the administrative determinations of the . . . Board is inapplicable." *Coleman*, 629 F.2d at 1081 n.4. Here, it is unnecessary to decide, and therefore we decline to reach, whether this holding survives the requirements of judicial deference to interpretations rendered through agency adjudication laid down by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and its progeny. *See United States v. Mead Corp.*, 533 U.S. 218, 230 ("We have recognized a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed.").

[9] *Compare Holly Farms*, 517 U.S. at 401 ("Holly Farms acknowledges that these crew members do not work 'on a farm.'"), *with Coleman*, (continued...)

[9] (...continued)
629 F.2d at 1080 ("Since there is no claim that these drivers work 'on a farm . . .'").

[10] *Compare Holly Farms*, 517 U.S. at 403 n.8 ("The Board reasonably responds . . . that . . . [a] feed-haul driver . . . must perform his or her work 'as an incident to or in conjunction with such farming operations' in order to fall under the agricultural exemption."), *with Coleman*, 629 F.2d at 1081 ("Transportation of grownout broiler chickens from the contract farms where they are raised to the processing plants where they are sold is clearly work performed 'by a farmer . . . as an incident to or in conjunction with' Sanderson's primary farming task of raising poultry.").

[11] *Holly Farms*, 517 U.S. at 400 (quoting *Bayside*, 429 U.S. at 302 n.9); *see also Coleman*, 629 F.2d at 1080 ("In [*NLRB v.*] *Strain Poultry* [*Farms, Inc.*, 405 F.2d 1025, 1032 (5th Cir. 1969),] we found that live haul drivers were employed in agriculture because the agricultural activities of independent contract growers were attributable to their employer. [The employer in *Bayside*] proposed that rationale in its own favor, arguing that the agricultural activity conducted on the independent growing farms was a part of its own farming operations. The Supreme Court, however, expressly rejected that analysis.").

Therefore, the *Coleman* court *must* have believed that when the drivers retrieved the chickens from the contract farmers and took them to "market," Sanderson Production's status as a "farmer" before it gave the chicks to the contract farmers was somehow still relevant to the drivers. Otherwise, the drivers' work could not have been "incident to or in conjunction with farming operations." In *Holly Farms*, however, after noting that delivering chicks to an independent contract farmer ends the producer's farmer status with respect to those chicks, the Court held that

> [*a*]*ccordingly*, when the live-haul employees arrive on the independent farms to collect broilers for carriage to slaughter and processing, Holly Farms *does not resume its status as "farmer"* with respect to those birds, the status Holly Farms had weeks before, when the birds were hatched in its hatcheries. *This conclusion, we note, entirely disposes of the contention that the truckdrivers are employed in secondary agriculture*[.]

517 U.S. at 400-401 (emphasis added).

This difference‑‑the only point of disagreement between the two opinions‑‑cannot be explained away by differences in the respective standards of review. The Court was not *merely* affirming the NLRB's determination; rather, it was *stating its opinion* that the determination logically flowed from the prior proposition. We are bound to follow this determination, and *Coleman* is overruled.[12]

Because Sanderson Productions's grounds for review lack merit, its petition is DENIED. the Board's motion for an enforcement order is GRANTED.

---

[12] Although the Supreme Court has not explicitly overruled *Coleman*, it purported to grant
(continued...)

[12] (...continued)
*certiorari* in *Holly Farms* "to resolve the division of authority" between courts that classified live-haul workers as employees and courts that found such workers to be engaged in agriculture. *Holly Farms*, 517 U.S. at 397 (citing *Coleman*).