KING, Circuit Judge,
dissenting:
Substantial evidence supports the NLRB’s decision. And substantial evidence supports the majority’s decision. In that situation, we are bound to enforce the NLRB’s decision. Accordingly, I would deny DirecTV’s petition for review and grant the NLRB’s petition for enforcement.
This court reviews the NLRB’s factual determinations[1] under the substantial evidence standard announced by the Supreme Court in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). See NLRB v. Cal-Maine Farms, Inc., 998 F.2d 1336, 1339 (5th Cir. 1993). “Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion,” El Paso Elec. Co. v. NLRB, 681 F.3d 651, 656 (5th Cir. 2012) (quoting Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993)), and “the ALJ’s decision must be upheld if á reasonable person could have found what the ALJ found, even if’ this court would have reached a different conclusion had it heard the case in the first instance, Standard Fittings Co. v. NLRB, 845 F.2d 1311, 1314 (5th Cir. 1988). “In determining whether the Board’s factual findings are supported by the record, we do not make credibility determinations or reweigh the evidence.” NLRB v. Allied Aviation Fueling, 490 F.3d 374, 378 (5th Cir. 2007); accord Ill. Cent. R.R. Co. v. Norfolk & W. Ry. Co., 385 U.S. 57, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966) (“It is not for the court [on substantial evidence review] to strike down conclusions that are reasonably drawn from the evidence and findings in the case.”). And “[o]nly in the most rare and unusual cases will an appellate court conclude that a finding of fact made by the ... Board is not supported by substantial evidence.” Merchs. Truck Line v. NLRB, 577 F.2d 1011, 1014 n. 3 (5th Cir. 1978) (quoting Ward v. NLRB, 462 F.2d 8, 9 (5th Cir. 1972)).
Before turning to the application of the substantial evidence test here, I briefly recount the relevant facts and procedural history to provide greater context for that test. Applying the two step analysis from Wright Line, a Div. of Wright Line, Inc., *854 251 NLRB 1083 (1980), the ALJ in this case concluded that (1) Gregory Ed-monds’s protected union activity was a motivating factor in DirecTV’s decision to terminate Edmonds and (2) DirecTV failed to establish that it would have terminated Edmonds absent his protected activity. In reaching these conclusions, the ALJ made a number of specific factual findings. As to Edmonds’s history, the ALJ noted that, while Edmonds was not a model employee given his disciplinary record, he had received higher-than-average customer satisfaction ratings, been recommended to apply for a supervisor position, received the highest salary possible given his position following several raises, and attained the classification of “service technician” based on his demonstrated skills and the work that he could competently perform. The ALJ noted that Edmonds first engaged in union activity in the spring or summer of 2010, when he met with union representatives at the home of coworker Brandon Ojeda.
Following the Ojeda meeting, in either May or June of 2010, Adrian Dimech, a DirecTV superior, conducted a meeting at the Riverside facility and expressed his opposition to unionization of the employees at that facility. At the Dimech meeting, Edmonds voiced several complaints and implied a desire for the employees at the Riverside facility to unionize. A few days after this meeting, Freddy Zambrano informed Edmonds that all of his work in the field for the day would be monitored, reviewed, and evaluated (although apparently the monitoring, etc. never actually occurred). On July 21, 2010, Edmonds loudly cursed at his supervisor, Zambrano, in front of a number of other employees, expressing concern about the long wait' times required to obtain equipment. The next day, Zambrano suspended Edmonds, stating explicitly that Edmonds was not going to be terminated. However, during Edmonds’s suspension, Zambrano communicated with Scott Thomas and the “HR department” and decided to terminate Ed-monds.
Based on these facts, the ALJ found that Edmonds had been engaged in protected activity at the Dimech meeting, and that “Zambrano warned Edmonds that his work was to be monitored as a result of his protected ... union activity.” The ALJ further found that these actions, combined with Edmonds’s subsequent suspension and firing, were sufficient under Wright Line to establish that Edmonds’s .protected union activity was a motivating factor in DirecTV’s termination decision. Therefore, the ALJ concluded that DirecTV had the burden to prove that it would have terminated Edmonds absent his union activity under the second step of the Wright Line analysis.
With respect to the second step, the ALJ found that “from the date of the Dimech meeting until July 22, Edmonds was never disciplined ... for any reason.” When' he received his initial suspension, Zambrano explicitly told Edmonds that he would not be terminated, and the form indicating his suspension did not include the term “pending investigation.” Based on this, the ALJ found that “Zambrano had ... decided ... shortly after the incident . . that Edmonds would be suspended but would not be discharged for his outburst.” The ALJ then found that “someone intervened between July 22 [when Edmonds was initially suspended] and July 28 [when Edmonds was terminated] to cause Zam-brano to change his mind and convert the suspension to a termination.” The ALJ specifically discredited Zambrano’s testimony that “he did not have his mind made up to discharge Edmonds” when Edmonds was initially suspended and noted that Zambrano “implicated others by telling Edmonds that after talking with Scott *855 Thomas — Zambrano’s boss and Dimech’s subordinate — and the HR department, it had been determined that his employment was being terminated.” Based on these findings, the ALJ concluded that DirecTV had not “affirmatively demonstrated that whatever it was that caused Zambrano to change his mind and convert Edmonds’[s] suspension to a discharge was not motivated by unlawful considerations.”
With respect to the first step of the Wright Line analysis, the majority characterizes the evidence supporting the ALJ’s determination that Edmonds’s union activity was a motivating factor in his termination as “very weak,” especially given that the ALJ made no specific finding as to when the Dimech meeting occurred.[2] However, in light of the fact that Edmonds engaged in protected activity, was singled out shortly after this activity for monitoring, and was later terminated, a “reasonable mind” could accept this evidence as “adequate to support [the] conclusion” that Edmonds’s union activity was a motivating factor in DirecTV’s decision to terminate his employment. El Paso Elec. Co., 681 F.3d at 656 (quoting Spellman, 1 F.3d at 360). Accordingly, I would hold that the ALJ’s conclusion was supported by substantial evidence — even if that decision was not supported by a preponderance of the evidence — instead of simply assuming arguendo this conclusion, as the majority does. See id. (“[Substantial evidence] is more than a mere scintilla, and less than a preponderance.” (emphasis omitted)).
With respect to the second step of the Wright Line analysis, I similarly disagree with the majority’s conclusion as to whether substantial evidence supported the ALJ’s conclusion that DirecTV failed to carry its burden to show that it would have terminated Edmonds absent his union activity. The majority offers three general reasons for why substantial evidence did not support the ALJ’s determination: (1) the “ALJ engaged in minimal discussion” of Edmonds’s disciplinary record; (2) DirecTV has terminated at least six other employees for similar reasons as it terminated Edmonds; and (3) the ALJ improperly inferred, based on the evidence, that Zambrano’s decision to terminate Ed-monds was motivated by unlawful considerations. However, none of these reasons supports the conclusion that substantial evidence did not support the ALJ’s conclusion.
As to the majority’s first criticism of the ALJ’s decision: while Edmonds did have a disciplinary record, he had also been promoted, received raises, and been invited to apply for a supervisor position. Therefore, the relative importance of Edmonds’s disciplinary history and his workplace achievements in DirecTV’s decision to terminate Edmonds was an inherently fact-intensive inquiry. And the ALJ ultimately emphasized Edmonds’s achievements over his failings in the workplace in concluding that DirecTV would not have terminated Edmonds absent his union activity. Given the record before the ALJ, “a reasonable person could have found what the ALJ *856 found,” and I would not disturb that finding here.[3] Standard Fittings Co., 845 F.2d at 1314.
As to the majority’s second criticism, the majority emphasizes that the ALJ discussed only one of the six other employees DirecTV had terminated for similar reasons as Edmonds. However, the ALJ did not conclude that Edmonds would not have been fired absent union activity because his disciplinary issues were less egregious than other employees’ issues. Instead, the ALJ concluded that Edmonds would not have been fired for his profane outburst because he made a specific factual finding that Zambrano had decided not to terminate Edmonds before speaking to his superiors. This factual finding was independent of how DirecTV had addressed disciplinary problems with other employees in the past. The ALJ concluded that Zambrano only decided to terminate Edmonds after speaking with the HR department and Scott Thomas, inferring from the facts before him that Zambrano decided to terminate Edmonds as a result of anti-union animus following this discussion. This factual finding, combined with the ALJ’s consideration of the only employee who had been terminated for profanity while working at the same facility as Edmonds, is sufficient to survive this court’s substantial evidence review.[4]
With respect to the majority’s final criticism, I cannot agree with the majority as to the impropriety of the ALJ’s inference that Zambrano’s conversation with his superiors caused him to change his mind and terminate Edmonds and that this change was motivated by unlawful considerations. As described above, the ALJ carefully analyzed the facts surrounding Zambrano’s change of heart and reasonably inferred that anti-union animus motivated Zambra-no’s termination decision after Zambrano admitted that he discussed Edmonds’s punishment with his superiors. While I agree that this inference was not compelled based on the facts in the record, I would not hold that this inference was unreasonable.[5]
Granting that Zambrano’s inference was reasonable, the majority concludes that “this circumstantial evidence does not undermine the uncontradicted evidence in support of DirecTV’s position that it would have fired Edmonds anyway.” However, “this circumstantial evidence” was anything but uncontradicted, as Zambrano had decided not to terminate Edmonds until he spoke with his superiors. Additionally, Edmonds’s extensive workplace *857 achievements, as emphasized by the ALJ, are evidence that DirecTV would not have terminated Edmonds absent his union activity.
Overall, the majority points to a number of reasons as to why the ALJ and NLRB could have reached a different result in this case. The majority correctly points out that substantial evidence supports findings contrary to those of the ALJ. However, the Supreme Court has explained that “[a] court reviewing an agency’s adjudicative action should accept the agency’s factual findings if those findings are supported by substantial evidence ... [and] should not supplant the agency’s findings merely by identifying alternative findings that could be supported by substantial evidence.” Arkansas v. Oklahoma, 503 U.S. 91, 112-13, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992). Because I would conclude that substantial evidence supports the NLRB’s decision in this case, I would deny DirecTV’s petition for review and grant the NLRB’s petition for enforcement. I respectfully dissent.

. As does the majority, I focus on the ALJ’s decision as opposed to the NLRB’s decision here because the ALJ engaged in the initial fact-finding with which the NLRB agreed. See, e.g., N.L.R.B. v. Gulf States United Tel. Co., 694 F.2d 92, 95 (5th Cir. 1982) (focusing on the findings of the ALJ, which were later adopted by the NLRB).

. The majority also notes that, assuming the Dimech meeting occurred in May, DirecTV had two opportunities to terminate Edmonds that it did not take advantage of, suggesting that anti-union animus was not a motivating factor in its ultimate termination decision. Evidence introduced by the parties showed that Edmonds was involved in a car accident while driving a company vehicle in May 2010 and that a customer complaint concerning Edmonds was forwarded to the Office of the President in June 2010. However, the ALJ explicitly found that Edmonds was not responsible for the car accident and that the complaint lacked merit. Therefore, according to the ALJ, DirecTV had no opportunity to use these incidents to terminate Edmonds, so the failure to previously terminate Edmonds did not suggest a lack of anti-union animus in the ultimate decision to terminate Edmonds.

. The majority’s reliance on Poly-Am., Inc. v. NLRB, 260 F.3d 465 (5th Cir. 2001), in reasoning that this court has held that the termination of an employee in a similar situation as Edmonds was not supported by substantial evidence is misplaced. As the majority notes, the employee in that case was still on a probationary period. Id. at 491. And while the majority recognizes that the employee received occasional praise in addition to exhibiting disciplinary issues, id. the praise received did not involve a promotion, multiple raises, and suggestions of applying for a supervisor position as in this case.

. Moreover, I agree with the NLRB's explanation that these five other employees, who worked at a different facility than Edmonds, were not directly comparable to Edmonds and, thus, the ALJ was under no obligation to consider them. The majority claims that, because it was Zambrano's superiors who imparted anti-union animus to Zambrano’s decision to terminate Edmonds, the proper point of comparison is all employees in the Southern California region. However, these other employees were not superviséd by Zambrano, and other facilities may have enforced DirecTV’s rules and policies differently.

. Moreover, the ALJ’s inference regarding Zambrano’s motives in terminating Edmonds rested, at least in part, on the ALJ’s finding that Zambrano was not a credible witness. And "this court will accord special deference to the [Board’s] credibility findings.” Cal-Maine Farms, 998 F.2d at 1339-40.