*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0170p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

GGNSC SPRINGFIELD LLC, dba Golden
Living Center-Springfield,
          *Petitioner/Cross-Respondent*,

      *v.*

NATIONAL LABOR RELATIONS BOARD,
          *Respondent/Cross-Petitioner*.

Nos. 12-1529/1628

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations Board.
No. 26-CA-072684.

Argued: March 15, 2013

Decided and Filed: July 2, 2013

Before: MERRITT, CLAY, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael A. Manzler, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Petitioner/Cross-Respondent. Mark R. Freeman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Gregoire Sauter, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:** Michael A. Manzler, Charles M. Roesch, Jessica E. Bauml, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Petitioner/Cross-Respondent. Mark R. Freeman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Gregoire Sauter, Robert J. Englehart, Linda Dreeben, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

     GRIFFIN, J., delivered the opinion of the court in which, CLAY, J., joined. MERRITT, J. (pp. 14–18), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

GRIFFIN, Circuit Judge.  This case involves the question whether registered nurses (RNs) employed as charge nurses at Golden Living Center (the "Center") are "supervisors" under the National Labor Relations Act (the "Act").  If they are, federal law does not allow them to collectively bargain with their employer.  After an evidentiary hearing, the regional director of the National Labor Relations Board concluded that the RNs are not supervisors.  We review to determine whether substantial evidence supports that determination and hold that it does not.  Accordingly, we grant the Center's petition for review, vacate the Board's order, and deny the Board's cross-application for enforcement.

I.

The Center operates a licensed nursing home in Springfield, Tennessee, that employs approximately 100 individuals.  The facility provides short- and long-term care to approximately 120 residents split evenly between the facility's two wings—East and West.  Patients range from those who are fully alert to those who are not.

The employment hierarchy at the nursing home is as follows:  the Executive Director oversees the entire facility.  Various department heads, including a Director of Nursing, report directly to the Executive Director.  Two Assistant Directors of Nursing directly oversee each of the facility's two wings.  Those primarily responsible for patient care include 12 RNs, 10 licensed practical nurses (LPNs), and 46 certified nursing assistants (CNAs).  The Center refers to its RNs and LPNs as "charge nurses."  (While RNs and LPNs have the same duties, only the RNs attempted to collectively bargain.)  Charge nurses report directly to the Director of Nursing or her designee.  Typically, two charge nurses are assigned to each wing at a time.  The number of CNAs assigned to each wing varies from two to six.

In October 2011, the International Association of Machinists and Aerospace Workers, AFL-CIO (the "Union"), petitioned the Board and sought to represent the Center's RNs in collective bargaining. The Center opposed the petition, claiming that its RNs (all charge nurses) were "supervisors" under the Act and therefore not permitted to unionize. *See* 29 U.S.C. §§ 152(3), 157. A hearing was held where evidence was received. In November 2011, the Board's regional director concluded that the RNs are not supervisors, certified the requested bargaining unit, and directed an election. The Board declined further review. The following day, the RNs elected the Union as their bargaining representative.

A week later, the Union asked the Center to bargain with it. The Center refused, prompting a complaint with the Board that alleged unfair labor practices. *See* 29 U.S.C. § 158(a)(1), (5). The Center admitted its refusal to bargain and contested only the regional director's decision to certify the bargaining unit. The Board sustained the Union's complaint and ordered the Center to bargain with it. This petition for review and cross-application for enforcement followed.

## II.

Before addressing the merits of the Center's petition, we consider a question raised regarding the composition of the Board. After briefing was complete, the Center filed a letter citing as supplemental authority the D.C. Circuit's recent opinion, *Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013), *cert. granted*, 81 U.S.L.W. 3629 (U.S. June 24, 2013) (No. 12-1281). In its supplemental authority letter, the Center asserted that the *Noel Canning* decision supplied "an additional, independent ground for vacating the Board's Order in this matter." Because the Center contends that its new argument has jurisdictional significance, we consider it at the outset. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998).

In *Noel Canning*, the D.C. Circuit held that an order of the Board was void because it was issued at a time when the Board did not have at least three lawfully appointed members. Our sister circuit ruled that at the time the order was issued, three of the Board's five members had been appointed by the President without "the Advice

and Consent of the Senate," in violation of the Constitution's Appointments Clause.[1] The court rejected the Board's argument that the President had legally bypassed that constitutional requirement by invoking the Recess Appointments Clause[2] and appointing the members during an *intra*session "recess" of the Senate, *i.e.*, one of the "breaks in the Senate's business when it is otherwise in a continuing session." *Noel Canning*, 705 F.3d at 499–500. The court found the Board's interpretation of the clause contrary to its text, structure, and historical interpretation, which all suggest that "the Recess" refers instead only to *inter*session recesses, *i.e.*, breaks between "the usually two or sometimes three sessions per Congress." *Id.* at 499–507. The court also concluded that the appointments were invalid because the vacancies they filled did not "happen" during a break between formal Senate sessions. *Id.* at 507–14.

The parties agree that *Noel Canning*'s legal conclusions, if followed here, would render the Board's order void. The Board asks that we not take up the challenge to its authority, claiming that the Center forfeited the argument by making it for the first time in a letter to us filed under Federal Rule of Appellate Procedure 28(j). *See Superior Bank, FSB v. Boyd (In re Lewis)*, 398 F.3d 735, 748 n.9 (6th Cir. 2005) (declining to consider a defense asserted for the first time in this way). The Center responds that its challenge is "jurisdictional" and thus can never be forfeited. If true, that would require us to address it before any non-jurisdictional challenges. *See Steel Co.*, 523 U.S. at 88–89. But the Center is mistaken. Errors regarding the appointments of officers under Article II are "nonjurisdictional." *See Freytag v. Comm'r*, 501 U.S. 868, 878–79 (1991); *accord Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 756 (D.C. Cir. 2009) (per curiam).

*Noel Canning* did not suggest otherwise. Its discussion of "jurisdiction," 705 F.3d at 496–98, concerned its statutory authority to consider challenges not first

---

[1]*See* U.S. Const. art. II, § 2, cl. 2 ("[The President] shall nominate, and by and with the advice and consent of the Senate, shall appoint . . . all other officers of the United States[.]").

[2]*See* U.S. Const. art. II, § 2, cl. 3 ("The President shall have power to fill up all vacancies that may happen during the recess of the Senate, by granting commissions which shall expire at the end of their next session.").

presented to the Board, *see* 29 U.S.C. § 160(e),**[3]** an exhaustion-type requirement that the Supreme Court has characterized as "jurisdictional," *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982); it did *not* concern jurisdiction in the sense that the court had an independent obligation to raise and consider the matter on its own, at the threshold, before reviewing the merits of the Board's decision, *cf., e.g.*, *Steel Co.*, 523 U.S. at 88–89.  That the D.C. Circuit in *Noel Canning* considered the petitioner's statutory challenge before addressing the constitutional one further demonstrates that it did not deem the constitutional one jurisdictional.  *But see NLRB v. New Vista Nursing & Rehab.*, — F.3d — , 2013 WL 2099742, at *3–6 (3d Cir. May 16, 2013) (deeming "jurisdictional" the statutory requirement that the member-groups to whom the Board delegates its authority always have at least three members, and concluding that "any reason" why the group has less than that (*e.g.*, an invalid Presidential appointment) can be raised as a jurisdictional defect).  Because we hold that the Center's belated challenge is not "jurisdictional," we are not *compelled* to consider it.  Nor need we consider excusing the Center's forfeiture in our discretion, for we are granting it the relief it seeks on the basis of its non-constitutional challenge.  *Cf. Noel Canning*, 705 F.3d at 493.

### III.

We review the Board's decision using the substantial-evidence standard. 29 U.S.C. § 160(e), (f).  Under this standard, the decision stands if it is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation marks omitted).  This standard, though deferential, does not permit the Board to ignore relevant evidence that detracts from its findings.  *Id.* at 488.  And when the Board "misconstrues or fails to consider important evidence, its conclusions are less likely to rest upon substantial evidence."  *Lakeland Health Care Assocs., LLC v. NLRB*, 696 F.3d 1332, 1335 (11th Cir. 2012) (internal quotation marks omitted).

---

**[3]** "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."  29 U.S.C. § 160(e); *see also id.* § 160(f).  Noel Canning raised its Appointments Clause challenge for the first time in a petition for review.  The D.C. Circuit held that extraordinary circumstances existed and took up the challenge.

IV.

A.

Only "employees" have the right to bargain collectively under federal law. 29 U.S.C. § 157.  The Act defines the term broadly (and somewhat circularly, *see id.* § 152(3) ("shall include any employee . . .")), but excludes "any individual employed as a supervisor," *id.*  A supervisor is

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

*Id.* § 152(11).  The Act thus creates "a three-part test for determining supervisory status."  *NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 712–13 (2001). Individuals are supervisors if (1) they hold the authority to engage in any one of the twelve listed supervisory functions, (2) their "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment," and (3) their authority is held "in the interest of the employer." 29 U.S.C. 152(11); *see Kentucky River*, 532 U.S. at 713.  The burden of proving supervisory status falls on the party asserting it.  *Frenchtown Acquisition Co. v. NLRB*, 683 F.3d 298, 305 (6th Cir. 2012).

The Center argued to the Board's regional director that its RNs are supervisors because they have authority to discipline, assign, and responsibly direct CNAs, all by using independent judgment.  It now argues that substantial evidence does not support the regional director's contrary determination.

B.

We begin with the Center's argument on discipline.  The Board's regional director determined that the Center's RN charge nurses lacked the authority to discipline CNAs, reasoning that they "merely report misconduct" to the Director of Nursing, a

function that he concluded "does not constitute supervisory authority." Critical to his determination was that RNs did not determine or provide input regarding what level of discipline to impose. The regional director further concluded that the RNs' authority to send CNAs home for the remainder of their shift in cases of patient abuse also does not establish supervisory status.

We summarily reject the Center's challenge to this last conclusion. The Board has repeatedly found that authority to send home employees, when limited to flagrant misconduct (*e.g.*, behavior that endangers the health or safety of patients), does not require independent judgment and therefore cannot establish supervisory authority. *See, e.g.*, *Vencor Hosp.-L.A.*, 328 NLRB 1136, 1139 (1999); *Northcrest Nursing Home*, 313 NLRB 491, 497 (1993). And we have agreed. *See Frenchtown*, 683 F.3d at 309; *accord Jochims v. NLRB*, 480 F.3d 1161, 1171–72 (D.C. Cir. 2007); *but see Warner Co. v. NLRB*, 365 F.2d 435, 439 (3d Cir. 1966) ("It can scarcely be denied that sending a man home is discipline or that it does require the use of independent judgment."). The regional director's decision in this respect is consistent with the Board's precedent and our own.

Turning to the heart of the regional director's decision on discipline, we must decide whether substantial evidence on the record as a whole supports the determination that the Center's RNs perform only a reporting function with respect to CNA misconduct, something the parties agree does not create supervisory status, *see also Carlisle Engineered Prods., Inc.*, 330 NLRB 1359, 1360 (2000). According to the Center, the record evidence shows that the disciplinary authority its RNs possess defies the regional director's characterization, and his adverse ruling is based upon a fundamental misunderstanding of the Center's disciplinary regime. We agree.

When confronted with CNA misconduct, RNs can either do nothing, provide verbal counseling (and decide whether to document the counseling), or draw up a written memorandum; choosing the appropriate path in each instance, the Center contends, involves independent judgment. The Board responds that a verbal warning, documented or not, is *educational* in nature, not disciplinary. The Board is correct. The Center's

written disciplinary policy never mentions verbal warnings. Karen Price, an Assistant Director of Nursing at the Center, testified that "verbal counseling doesn't count against you like a written warning would. It's not part of the four-step process." Charge nurse Vicki Jones said much the same. Thus, even though RNs have a choice between ignoring the infraction or offering verbal counseling, that does not make them supervisors because they do not impose discipline when giving verbal counseling. *Cf. Frenchtown*, 683 F.3d at 306–08 (agreeing that "one-on-one in-services" used "to correct the aides' performance by educating aides on what is expected of them" were "outside of the realm of discipline" where, among other things, the employer's disciplinary policy did not mention them and they could not lead to formal discipline).

However, the Board's point regarding the irrelevance of an RN's choice between doing nothing and providing verbal counseling fails to answer the Center's charge that RNs may also proceed by way of an employee memorandum, which the Center contends *is* part of its progressive disciplinary system and is thus discipline. The Center's arguments are persuasive. Receipt of an employee memorandum leads automatically to a written warning, which is a "step" in the Center's system of progressive discipline. Therefore, the authority that RNs have to issue memoranda to CNAs is the authority to discipline. And because RNs exercise independent judgment in choosing whether to issue a memoranda or provide verbal counseling, they are supervisors under the Act. The Board's failure to acknowledge that receipt of a written warning *is* itself discipline renders its contrary determination unsupported by substantial evidence. *See, e.g.*, *Lakeland Health Care Assocs.*, 696 F.3d at 1335.

The Center's employee handbook divides disciplinary infractions into two camps. Category one violations "are the most serious and are subject to the employee's immediate suspension, pending investigation for discharge" (*e.g.*, resident abuse or neglect, possession of a firearm on the premises), while those in category two are "less serious in nature" (*e.g.*, failure to perform assigned duties, poor work quality or productivity, stopping work early). Category one offenses "are subject to the employee's immediate suspension, pending investigation for discharge." Progressive

discipline, by contrast, is imposed for category two types and gives the employee multiple opportunities before being suspended and then fired. "Written warnings" are received for an employee's first three category two violations. Termination will normally occur for the fourth infraction. CNA Lena Harness, for example, was fired after receiving four memoranda in a year. Her first two were for failure to perform assigned duties; her last two were for violating the Center's formal attendance policy.

The Center's Human Resources Management Policies and Procedures Manual echos its handbook and provides further detail. It institutes the "Employee Memorandum," which implements the Center's discipline policy. A memorandum is valid for twelve months, after which time it "becomes invalid for use in progressive discipline or discharge[.]" The manual also provides that "[v]iolations of different rules are cumulative for purposes of progressive discipline even if unrelated or remote." Each of the first three category two violations in a twelve-month period yields a written warning (steps "one" through "three"), with the fourth leading to suspension pending an investigation (step "four"). Discharge follows "if the investigation indicates that the misconduct occurred."

Then there is the employee memorandum form itself. This pre-printed form includes a space for explaining the violation and for listing the employee's disciplinary actions for the past twelve months; it appears that the charge nurse does not list the CNA's prior disciplinary history and instead leaves that part blank. The form then asks for the category of violation observed, which the charge nurse indicates. If the box for "Category Two Violation" is noted, the form asks which "step" in the process the violation constitutes, the answer to which depends entirely on the number of written warnings received over the last year. Charge nurses do not indicate which step is involved, because they typically do not know. The cited CNA signs the form on the line indicated "Employee," and the charge nurse signs on the line for "Supervisor." Sometimes the Director of Nursing or the Assistant Director signs the form, either underneath the charge nurse's signature or sometimes as the sole signature of the

"supervisor." For example, Harness's first two violations were signed by charge nurses; her last two were signed by the Director of Nursing.

Consistent with these documents, assistant nursing director Karen Price testified unequivocally that a memorandum is "considered a write-up or disciplinary action" that is part of the Center's "four-step process." That point is obvious, and not one person or document refutes it. Nevertheless, the Board contends that the Center failed to prove that employee memoranda "trigger investigations or have a disciplinary effect, or serve any purpose beyond informing management about employee misconduct." That claim is inaccurate and not supported by the record.

The Board relies upon a single exchange between counsel and charge nurse Vicki Jones:

> Q. Is your role then limited to documenting the incident or do you do more?
>
> A. That's it.

But Jones also testified that she can "impose discipline" upon CNAs who violate company policy by completing a memorandum. And while an RN's role in the process is limited to completing the employee memorandum and submitting it to the Director of Nursing, it is that very act that leads directly and automatically to a written warning—a "step" in the company's policy of progressive discipline.

The Board's position on discipline is essentially that, to be considered "discipline," the employee must suffer some immediate adverse employment action as a result of receiving an employee memorandum, such as suspension or termination, and because RN charge nurses cannot suspend or terminate a CNA's employment unilaterally, they lack authority to discipline. This position runs headlong into the labor statute's plain text. Discipline cannot be synonymous with suspension or termination, for the statute lists these supervisory functions individually, and in the disjunctive: A supervisor is "any individual having authority . . . to . . . suspend, . . . discharge, . . . *or* discipline other employees . . . ." 29 U.S.C. § 152(11) (emphasis added); *see Kentucky*

*River*, 532 U.S. at 713 (supervisors "hold the authority to engage in *any 1* of the 12 listed supervisory functions" (emphasis added)).  Equating the term *discipline* with the terms *suspend* or *discharge* would render it superfluous, a reading we must try to avoid.  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991).  The term *discipline* must capture something less.

The Board has in other cases acknowledged that discipline is something less.  It has said, for example, that "for the issuance of reprimands or warnings to constitute statutory supervisory authority, the warning must not only initiate, or be considered in determining future disciplinary action, but also it must be the basis of later personnel action without independent investigation or review by other supervisors." *Phelps Cmty. Med. Ctr.*, 295 NLRB 486, 490 (1989) (internal quotation marks omitted).  Further, a warning need not "*automatically* lead[] to an action affecting employment. . . .  [I]t is sufficient that the discipline has the real potential to lead to an impact on employment." *Progressive Transp. Servs. Inc.*, 340 NLRB 1044, 1046 (2003).  The Board has also explained that write-ups are a form of discipline where they "lay a foundation, under [a] progressive disciplinary system," for later personnel action, such as suspension or termination. *Oak Park Nursing Care Ctr.*, 351 NLRB 27, 28, 29 (2007).  Generally, where an employer maintains a defined progressive discipline policy, and cited violations of company policy count toward the number of missteps permitted before termination, those with independent authority to issue the citations are supervisors. *See, e.g.*, *Concourse Vill., Inc.*, 276 NLRB 12, 13 (1985); *see also Waverly-Cedar Falls Health Care*, 297 NLRB 390, 392 (1989); *Ohio Masonic Home*, 295 NLRB 390, 393–94 (1989); *Passavant Health Ctr.*, 284 NLRB 887, 889–90 (1987).

In the present case, the written warnings that follow from receipt of an employee memoranda satisfy the criteria for discipline.  Under the Center's progressive discipline policy, the existence of earlier written warnings determines whether suspension and termination are imposed for a later category two violation, based upon the number of warnings already received that year.  The actions giving rise to memoranda are investigated neither at the time of the infraction nor later, when the warning provides a

basis for the CNA's suspension and termination; only the fourth memoranda received in a twelve-month period is investigated before the employee is terminated. The warnings thus "lay a foundation" for future adverse employment action. Accordingly, memoranda/warnings are discipline. Substantial evidence does not support the regional director's contrary determination.

The record also demonstrates that RNs exercise independent judgment when issuing employee memoranda. There is no doubt that when faced with a lesser violation the Center's RNs choose whether to issue an employee memorandum (discipline), to provide verbal counseling (not discipline), or to take no action at all. The choice depends on the RN's determination of how severe the violation is, and, indeed, the record contains instances of a CNA's failure to perform assigned duties or having a poor work product being handled differently by the RNs; sometimes the CNA received verbal counseling, and sometimes she received a memorandum. The Board has before determined that making this type of choice requires independent judgment. *See Oak Park Nursing Care Ctr.*, 351 NLRB at 29. We have said the same. *See Extendicare Health Servs., Inc. v. NLRB*, 182 F. App'x 412, 417 (6th Cir. 2006).

The larger question is whether the RNs must consult with a superior and obtain approval before issuing a memorandum; if they must, their judgment is unlikely "independent." *See Oakwood Healthcare, Inc.*, 348 NLRB 686, 692–93 (2006); *Phelps Cmty. Med. Ctr.*, 295 NLRB at 490–91. The record shows that consultation and approval is neither required nor typical. Karen Price testified that none is required. She also said that memoranda are forwarded to her for information purposes only, so that she knows what happens on the floor, not so that she can approve (or reject) the RN's decision.

In addition, Vicki Jones described her involvement with memoranda as follows: "I call [the Director of Nursing] on the phone. I show her where the situation is. I fill out the form and I slip it under her door. And I don't hear anything back, no feedback on it." She explained that sometimes the Director will suggest how to proceed, "[b]ut for the most part," Jones continued, the Director "just listens." That advice *sometimes*

is provided does not mean that Jones or others do not typically exercise discretion in deciding how to proceed—they do. Indeed, Jones's use of the word *sometimes* demonstrates that it is *not* the norm. *Compare Concourse Vill.*, 276 NLRB at 13 (worker's issuance of some warnings pursuant to a superior's directive did not negate supervisor status based on disciplinary authority, because the worker issued other warnings independently); *with Highland Superstores, Inc. v. NLRB*, 927 F.2d 918, 922 (6th Cir. 1991) (leadman was not a supervisor when he issued a disciplinary notice only when instructed).

Just one statement from Jones points the other way, and it cannot support a finding that RN authority to discipline is of a "routine or clerical nature." When asked if she can resolve disciplinary problems on her own or if she instead seeks guidance, Jones responded, "I seek guidance." But she neither explained her answer nor provided details. Moreover, she earlier testified that no one instructs her when to fill out an employee memorandum in a given situation; it is *her* choice. In view of the record as a whole, the Center plainly met its burden to demonstrate that its RNs utilize independent judgment in exercising their disciplinary authority.

V.

For these reasons, substantial evidence does not support the Board's decision that RNs at the Center lack authority to discipline CNAs using their independent judgment. The record instead compels a contrary determination. The Center's RNs are supervisors under the Act, and, as a result, the Center's refusal to bargain with the RNs' union representative did not violate the Act. We grant the Center's petition for review, vacate the Board's order of April 9, 2012, and deny the Board's cross-application for enforcement.

―――――――――――――

**DISSENT**

―――――――――――――

MERRITT, Circuit Judge, dissenting. In reaching its judgment against the union, the court expands the meaning of "discipline" beyond any dictionary definition and engages in linguistic wordplay over the word without even referring to or trying to understand the purpose of the statutory language at issue.

1.  Denying RNs the Right to Union Membership Defies Congressional Intent. — Under the labor laws, the definition of "discipline" is directly linked to the question of whether a person is a "supervisor" and hence a part of management. The whole purpose of defining "discipline" is to establish whether an employee is a "supervisor" and therefore excluded from union membership. The purpose is simply to insure that supervisors will be loyal to their employers and not be tempted to serve the union's conflicting interests. The Supreme Court has explained the purpose of this labor-law distinction between regular and supervisory employees:

> There were differences in the specific [proposed] provisions addressed to supervisory employees, but no difference in objective. Employers were not to be obliged to recognize and bargain with unions including or composed of supervisors, because supervisors were management obliged to be loyal to their employer's interests, and their identity with the interests of rank-and-file employees might impair that loyalty and threaten realization of the basic ends of federal labor legislation.

*Beasley v. Food Fair of N.C., Inc.,* 416 U.S. 653, 659-660 (1974) (a unanimous decision quoting at length the House and Senate Reports concerning the union-membership exemption for supervisory employees who have the authority to "hire," "fire," and "discipline" other employees) (footnotes omitted).

When disciplinary action against a nurse or hospital employee comes only after the director of nursing or the assistant director conducts an investigation and exercises independent judgment or authority — as is true in this case — the RNs' write-ups are simply informational. The RNs do not exercise the required independent judgment about

discipline. They may exercise discretion or choice about whether to make a report, but they exercise no independent judgment or any authority about disciplining another employee. Obviously, if every employee who is allowed or invited by management to make a report and pass on information to the employer about fellow employees is denied the right to union membership, there would be very few employees eligible for union membership. Under the majority's theory, an employer could simply invite all of its employees to make reports on other employees. Any such employee would play a role in the "disciplinary process" and hence become a "supervisor." The employee would be excluded from membership in a union and denied the right to collective bargaining. This is the broad standard the majority has adopted, and it is in direct conflict with the purpose of the Wagner and the Taft-Hartley Acts. It is a standard designed simply to foreclose collective bargaining, avoid unions, and go back to the unstable labor-management relations that existed prior to the New Deal.

    2. Finding the RNs to Be Supervisors Is Inconsistent with Precedent. — See, for example, *Frenchtown Acquisition Co. v. NLRB*, 683 F.3d 298, 308 (6th Cir. 2012), a case similar to this one holding that the fact that a report could result in disciplinary action is irrelevant and not enough to make the filer of the complaint a supervisor.[1] *See also NLRB v. Meenan Oil Co.*, 139 F.3d 311, 322 (2d Cir. 1998) (holding that a dispatcher who notifies a supervisor to complain about an employee's conduct is merely acting as a conduit for information and exercises no disciplinary judgment in passing along the complaint). The majority's broad construction of the word "discipline" and

---

    [1]The Court in *Frenchtown* explained as follows:

> Deciding whether an individual is a supervisor is a "highly fact intensive inquiry." *Kentucky River Community Care, Inc. v. NLRB*, 193 F.3d 444, 453 (6th Cir. 2000), *aff'd, Kentucky River*, 532 U.S. 706, 121 S. Ct. 1861. In conducting this inquiry, the Board and "reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399, 116 S. Ct. 1396, 134 L.Ed.2d 593 (1996) (deferring to the Board's decision that certain workers were not "agricultural laborer[s]" and were therefore eligible to unionize under the Act). This court has endorsed the same principle in the context of determining whether individuals are supervisors. "It is important for the Board not to construe supervisory status too broadly, for a worker who is deemed to be a supervisor loses his organizational rights." *Williamson Piggly Wiggly v. NLRB*, 827 F.2d 1098, 1100 (6th Cir. 1987) (brackets and internal quotation marks omitted).

683 F.3d at 305.

"supervisory status" will defeat the entire process of union recognition in the health care field under the Wagner and Taft-Hartley Acts. *See* Kristin Hay O'Neal, Comment and Note, "*NLRB v. Health Care & Retirement Corporation of America:* Possible Implications for Supervisory Status Analysis of Professionals under the National Labor Relations Act," 47 BAYLOR L. REV. 841 (1995).

The employer relies heavily on an unpublished case without precedential value, *Extendicare Health Servs., Inc. v. NLRB*, 182 F. App'x 412, 416-17 (6th Cir. 2006), but in that case a write-up initiated formal disciplinary proceedings, which led directly and automatically to an investigation and appropriate sanction. Here, there is no such automatic trigger. The RNs here do not have access to employee files so they have no idea if they are the first to complain or the last and have no way of knowing whether their particular complaint led to any discipline and, if so, what kind. App'x 125-27. The employee forms contain a section to indicate the "step" in a process, but the nurses leave this section blank and, in fact, must do so because there is no way of knowing what stage the employee is in. App'x 92. The Human Resources Management Policies and Procedures Manual explicitly states that appropriate discipline will be determined "at the Company's discretion on the basis of the particular facts or circumstances." App'x 265. In short, there was evidence to support the finding that the nurses have no authority over disciplinary action, they are not present when such action is imposed, and they are simply left with the ministerial task of filling out the complaint form. That hardly qualifies them as a "supervisor" who has become a member of management and lost her eligibility for union membership.

3. The Majority Opinion Is Inconsistent with Chevron Deference. — In *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the Supreme Court held that where Congress fails to resolve ambiguity in the meaning of words — words like "discipline" in this case — the courts must defer to an agency's interpretation if it "is based on a permissible construction of the statute." *Id*. at 843. The Supreme Court has applied *Chevron* deference in several NLRB cases. For example, in *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398-99 (1996), the Court said:

> When the legislative prescription is not free from ambiguity, the administrator must choose between conflicting reasonable interpretations. Courts, in turn, must respect the judgment of the agency empowered to apply the law "to varying fact patterns," even if the issue "with nearly equal reason [might] be resolved one way rather than another."

The NLRB has a longstanding interpretation of the term "discipline" that we should pay deference to. To be considered "discipline" under the statute, a warning or write-up must "not only initiate, or be considered in determining future disciplinary action, but also it must be the basis of later personnel action without independent investigation or review by other supervisors." *Passavant Health Ctr.*, 284 N.L.R.B. 887, 890 (1987). Mere complaints that "do not alone affect job status or tenure do not constitute supervisory authority" and amount to "nothing more than a reporting function." *Id.* at 889. The employer in this case does not challenge the reasonableness of this definition of "discipline." Neither does the majority. They just assert that the forms meet the test. Manifestly, the forms do not convert the RNs into supervisors. The employee memorandums lead to no consequences until higher management steps in, independently investigates the situation, and makes a management decision.

4. <u>No Action by Management Taken Arising from a RN Write-Up</u>. — Counsel for the NLRB in its brief states as a fact: "The Center does not cite a single instance in which a write-up written by a charge nurse resulted in an investigation or disciplinary proceeding." NLRB Br. at 12. Apparently, neither can the majority find any instance in the entire history of the company where an RN's write-up against a fellow employee caused any punishment at all by a supervisor or an executive — not even a frown, a warning, a threat to suspend or reduce pay, or any other real disciplinary action. It speaks volumes about the meaning of the ambiguous word "discipline" in this case that the employer and my colleagues can find no instance in which an RN's complaint has ever led directly to anything resembling an order, command, chastisement, or correction designed to alter a nurse's behavior. The company has drafted a nominal procedure that has never led to anything but an excuse for allowing the company to avoid recognizing and bargaining collectively with the union that its employees voted for as their

representative.  That anti-union purpose seems to be the only real purpose of the form; and, thanks to the court, the company has gotten away with its anti-union charade despite the purpose of the labor statute, the NLRB's factual findings, and the deference that this court is supposed to give the administrative agency.  The testimony of RN Vicki Jones reinforces the administrative agency's conclusion that the forms are just a way to defeat the union:

> Hearing Officer Adkins:  Is your role then limited to documenting the incident or do you do more?
>
> Jones:  That's it. . . .
>
> Hearing Officer:  What involvement if any does the [Director of Nursing] have in these forms with you?  Do you all sit down together, go over them together?
>
> Jones:  No, ma'am.  I call her on the phone.  I show her where the situation is.  I fill out the form and I slip it under her door.  And I don't hear anything back, no feedback on it.

App'x 125, 127.

Should this type of arrangement turn the RN into a "supervisor" or member of management that makes her ineligible for union membership, collective bargaining, or representation?